Irving **BERLIN** et al., **Plaintiffs-Appellants,**

v.

E. C. **PUBLICATIONS, INC.**, et al., **Defendants-Appellees.**

**No. 255, Docket 28502.**

United States Court of Appeals Second Circuit.

Argued Jan. 10, 1964.

Decided March 23, 1964.

---

Julian T. Abeles, New York City, for plaintiffs-appellants.

Martin J. Scheiman, of Scheiman, Albert & MacLean, New York City (Jack N. Albert, New York City, of counsel), for defendants-appellees.

Before LUMBARD, Chief Judge, and KAUFMAN and MARSHALL, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge.

Through depression and boom, war and peace, Tin Pan Alley has light-heartedly insisted that "the whole world laughs" with a laugher, and that "the best things in life are free." In an apparent departure from these delightful sentiments, the owners of the copyrights upon some twenty-five popular songs instituted this action against the publishers, employees and distributors of "Mad Magazine," alleging that Mad's publication of satiric parody lyrics to plaintiffs' songs infringed the copyrighted originals, despite Mad's failure to reproduce the music of plaintiffs' compositions in any form whatsoever. Twenty-five causes of action were alleged, each representing a particular song copyrighted by the plaintiffs and parodied by the defendants.

On cross-motions under Rule 56, F.R.Civ.P., the District Court awarded summary judgment to the defendants as to twenty-three of the claims, finding no similarities in mood, content, or purpose between the original lyrics and the parodies; concluding that the two remaining causes of action presented closer questions, the court denied summary relief to both parties as to these two claims. Asserting that the District Court decision constituted an invitation to plagiarism, the plaintiffs appealed.[1]

The validity of plaintiffs'·copyrights has never been challenged, and we need concern ourselves here only with the nature, purpose and effect of the alleged infringements. The parodies were published as a "special bonus" to the Fourth Annual Edition of Mad, whose cover characterized its contents as "More Trash From Mad—A Sickening Collec-

1. Despite the denial of summary judgment as to two causes of action, the dismissal of twenty-three of plaintiffs' claims is clearly appealable at this juncture. 28 U.S.C. § 1292(a) (1) confers jurisdiction upon this Court to hear appeals from interlocutory orders where, as here, a prayer for injunctive relief has been denied.

tion of Humor and Satire From Past Issues," and almost prophetically carried this admonition for its readers: "For Solo or Group Participation (Followed by Arrest)." Defendants' efforts were billed as "a collection of parody lyrics to 57 old standards which reflect the idiotic world we live in today." Divided into nine categories, ranging from "Songs of Space & The Atom" to "Songs of Sports," they were accompanied by the notation that they were to be "Sung to" or "Sung to the tune of" a well-known popular song—in twenty-five cases, the plaintiffs' copyrighted compositions. So that this musical direction might feasibly be obeyed, the parodies were written in the same meter as the original lyrics.

The District Court observed that the theme and content of the parodies differed markedly from those of the originals. Thus, "The Last Time I Saw Paris," originally written as a nostalgic ballad which tenderly recalled pre-war France, became in defendants' hands "The First Time I Saw Maris," a caustic commentary upon the tendency of a baseball hero to become a television pitchman, more prone to tempt injury with the razor blade which he advertises than with the hazards of the game which he plays. Similarly, defendants transformed the plaintiffs' "A Pretty Girl Is Like a Melody," into "Louella Schwartz Describes Her Malady"; what was originally a tribute to feminine beauty became a burlesque of a feminine hypochondriac troubled with sleeplessness and a propensity to tell the world of her plight. As might be inferred from the range of categories presented and the foregoing examples of defendants' works, the parodies were as diverse in their targets for satire as they were broad in their humor.

While the plaintiffs have resolutely insisted that the defendants' use of the original songs as a vehicle for the parodies was wrongful, and have alleged, in general terms, that the claimed infringements "caused substantial and irreparable damage," they have not indicated with any degree of particularity the manner in which injury might have been inflicted.

There is no allegation akin to "passing-off"; with considerable reason, the plaintiffs have not asserted that the music-buying public could have had any difficulty in differentiating between the works of plaintiffs and defendants. Neither is there a claim that defendants' parodies might satisfy or even partially fulfill the demand for plaintiffs' originals; quite soundly, it is not suggested that "Louella Schwartz Describes Her Malady" might be an acceptable substitute for a potential patron of "A Pretty Girl Is Like a Melody."

Rather, plaintiffs appear to seek redress upon a theory of copyright relief, closely resembling that behind recovery for unjust enrichment. Pointing to the use of the titles, the meter, and an occasional phrase from the original lyrics in an occasional song, the plaintiffs insist that their copyrighted efforts were improperly appropriated by the defendants for their own financial gain. Asserting that the copyright laws restrict the economic benefits of copyrighted works to the copyright holders, they reject the notion that a parody or burlesque version of the original may ever be justified as the sort of "fair use" which traditionally has permitted a literary critic to employ limited quotations from the copyrighted work under review. Cf. Lawrence v. Dano, 15 Fed.Cas. 25, 61 (No. 8136) (C.C.D.Mass. 1869). Indeed the plaintiffs broadly maintain, "copying for commercial gain may never be fair use" and thus, in effect, they refuse to recognize parody and burlesque as independent forms of creative effort possessing distinctive literary qualities worthy of judicial protection in the public interest.

While indeed broad, the area in which a copyright proprietor is permitted the exclusive commercial benefits of his copyrighted work is clearly not without limit. In the words of Article I, Section 8, of the Constitution, copyright protection is designed "To promote the Progress of Science and useful Arts," and the financial reward guaranteed to the copyright holder is but an incident of this general objective, rather than an end

in itself. As a result, courts in passing upon particular claims of infringement must occasionally subordinate the copyright holder's interest in a maximum financial return to the greater public interest in the development of art, science and industry. See Gorman, Copyright Protection for the Collection and Representation of Facts, 76 Harv.L.Rev. 1569 (1963).

Turning to the specific question before us, we find that the extent to which a parodist may borrow from the work he attempts to burlesque is largely unsettled. The earlier American cases, although generally cited in most discussions of the question, are of little assistance. Such decisions as Bloom & Hamlin v. Nixon, 125 F. 977 (C.C.E.D.Pa.1903); Green v. Minzensheimer, 177 F. 286 (C.C.S.D.N.Y. 1909); and Green v. Luby, 177 F. 287 (C.C.S.D.N.Y.1909), did not deal with the parody of a copyrighted work, but with imitations of a particular artist's style of performing, in which portions of a copyrighted song were incidentally employed. Cf. Broadway Music Corp. v. F-R Pub. Corp., 31 F.Supp. 817 (S.D.N.Y.1940). Alternatively, in Hill v. Whalen & Martell, Inc., 220 F. 359 (S.D.N.Y.1914), the defense of "parody" or "burlesque" was clearly invoked in bad faith, as an attempt to justify a taking designed substantially to satisfy the demand for the copyrighted original.

Most contemporary discussions of the treatment to be afforded parody were stimulated by two related cases which arose in the Southern District of California. See Loew's, Inc. v. Columbia Broadcasting System, 131 F.Supp. 165 (S.D.Cal.1955), aff'd sub nom. Benny v. Loew's, Inc., 239 F.2d 532 (9th Cir. 1956), aff'd by an equally divided court, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583 (1958); Columbia Pictures Corp. v. National Broadcasting Co., 137 F.Supp. 348 (S.D.Cal.1955). In the Loew's case, television comedian Jack Benny was alleged to have infringed the copyright upon "Gaslight," a motion picture which he satirized in a televised sketch entitled "Autolight"; in the Columbia litigation, "From Here to Obscurity," a television burlesque by comedian Sid Caesar upon the screen version of "From Here to Eternity," was at issue. Although the same District Judge wrote the opinions in both cases, the plaintiffs were permitted to recover for the Benny parody, but were denied relief in the Caesar case.

The distinction between the two situations, Judge Carter reasoned, turned on the relative significance or "substantiality"—in terms of both quality and quantity—of the material taken from the original motion pictures. In both cases, the Court recognized in painstaking and scholarly opinions the historic importance and social value of parody and burlesque; in both, it conceded that the parodist must be permitted sufficient latitude to cause his reader or viewer to "recall or conjure up" the original work if the parody is to be successful. But in Benny's case, the Court concluded, this license had been grossly exceeded. Not only had the parody followed the general plot of the original motion picture, but specific incidents and details had been copied and extensive portions of the dialogue had been reproduced verbatim. It was this borrowing from the original to a far greater degree than that required if the parody is to "recall or conjure up" that original, which caused the court to reject the defense of "burlesque"; and, it was in this context that the Court of Appeals for the Ninth Circuit affirmed Judge Carter's determination.

But despite Benny's "borrowing" of substantially more material from the copyrighted original than was necessary for a successful burlesque, the Benny holding and its accompanying dictum suggesting that parody could not be justified as "fair use" was roundly criticized by many commentators. See, e. g., Comment, Parody and the Law of Copyright, 29 Fordham L.Rev. 570 (1961); Note, Parody and Burlesque—Fair Use or Copyright Infringement?, 12 Vand.L. Rev. 459 (1959); Note, Parody and

Copyright Infringement, 56 Colum.L.Rev. 585 (1956). But see Selvin,[2] Parody and Burlesque of Copyrighted Works as Infringement, 6 Copyright Soc'y Bull. 53 (1958). Several scholars believed that the decisions of both the District Court and the Court of Appeals were unduly restrictive; the fear was expressed that the art of parody, which has thrived from the time of Chaucer to, on a somewhat different level, the current vogue for the lyrics of Allen Sherman, would be stifled if its propriety were tested entirely by the precise amount appropriated from the original.

In the present case, it is not necessary to determine whether parody and satire require a greater freedom than that afforded by the "substantiality" test outlined in Benny. We believe in any event that the parody lyrics involved in this appeal would be permissible under the most rigorous application of the "substantiality" requirement. The disparities in theme, content and style between the original lyrics and the alleged infringements could hardly be greater. In the vast majority of cases, the rhyme scheme of the parodies bears no relationship whatsoever to that of the originals. While brief phrases of the original lyrics were occasionally injected into the parodies, this practice would seem necessary if the defendants' efforts were to "recall or conjure up" the originals; the humorous effect achieved when a familiar line is interposed in a totally incongruous setting, traditionally a tool of parodists, scarcely amounts to a "substantial" taking, if that standard is not to be woodenly applied. Similarly, the fact that de-

fendants' parodies were written in the same meter as plaintiffs' compositions would seem inevitable if the original was to be recognized, but such a justification is not even necessary; we doubt that even so eminent a composer as plaintiff Irving Berlin should be permitted to claim a property interest in iambic pentameter.

In short, we believe that whatever use was made of the plaintiffs' works in this case fell far short of the "substantial" takings which were involved in Benny, even if we were to find the rationale of that opinion persuasive.[3] While the social interest in encouraging the broad-gauged burlesques of Mad Magazine is admittedly not readily apparent, and our individual tastes may prefer a more subtle brand of humor, this can hardly be dispositive here. Cf. Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 47 L.Ed. 460 (1903). For, as a general proposition, we believe that parody and satire *are* deserving of substantial freedom—both as entertainment and as a form of social and literary criticism. As the readers of Cervantes' "Don Quixote" and Swift's "Gulliver's Travels," or the parodies of a modern master such as Max Beerbohm well know, many a true word is indeed spoken in jest. At the very least, where, as here, it is clear that the parody has neither the intent nor the effect of fulfilling the demand for the original, and where the parodist does not appropriate a greater amount of the original work than is necessary to "recall or conjure up" the object of his satire, a finding of infringement would be improper.

Judgment affirmed.

2. Mr. Selvin was counsel for the successful plaintiffs in the Benny case.

3. Although the Benny decision was affirmed by an equally divided Supreme Court, 356 U.S. 43, 78 S.Ct. 667, 2 L. Ed.2d 583 (1958), it is clearly not binding upon us. "Under the precedents of this court, and, as seems justified by reason as well as by authority, an affirmance by an equally divided court is as

between the parties, a conclusive determination and adjudication of the matter adjudged; but the principles of law involved not having been agreed upon by a majority of the court sitting prevents the case from becoming an authority for the determination of other cases, either in this or in inferior courts." Hertz v. Woodman, 218 U.S. 205, 213–214, 30 S.Ct. 621, 623, 54 L.Ed. 1001 (1910).