**TIN PAN APPLE, INC., Sutra Records, Inc., Fools Prayer Music, Inc., and Mar Morales, Darren Robinson, and Damon Wimbley (together p/k/a the "Fat Boys"), Plaintiffs,**

v.

**MILLER BREWING CO., INC., Backer & Spielvogel, Inc. and Joe Piscopo, Defendants.**

No. 88 Civ. 4085 (CSH).

United States District Court,
S.D. New York.

May 14, 1990.

Richards & O'Neil, New York City, for plaintiffs; Jonathan Zavin, of counsel.

Davis & Gilbert, New York City, for defendants; Howard J. Schwartz, Maribel Figueredo, Bruce Ginsberg, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff's amended complaint asserts causes of action for copyright infringement under 17 U.S.C. §§ 101 *et seq.*, false designation of origin and unfair competition under 15 U.S.C. §§ 1114 and 1125(a), and state statutory and common law claims under principles of pendent jurisdiction.

Defendants move under Rule 12(b)(6), F.R.Civ.P., to dismiss the amended complaint for failure to state a claim upon which relief can be granted. In the alternative, defendants move under Rule 12(e) and (f) for a more definite statement and to strike certain allegations of plaintiffs' pleading.

### Background

This action arises out of the professional activities of the three individual plaintiffs, Mark Morales, Darren Robinson, and Damon Wimbley, professionally known as the "Fat Boys." The amended complaint alleges that by 1983, these plaintiffs were singing together and performing in a distinctive singing style known as "rapping." Rapping is generally alleged to be "spoken or semi-sung rhyming verse recited over a powerful rhythm track created by drums and drum sounds; it is lyrics over an almost exclusively percussion-based melody." Amended complaint at ¶ 11.

Plaintiff Tin Pan Apple, Inc. is alleged to be the owner of the registered service mark FAT BOYS for performing services and a copyright owner of various FAT BOYS sound recordings. Plaintiff Sutra Records, Inc. is the copyright owner of various FAT BOYS sound recordings, including specific recordings listed in ¶ 16 of the amended complaint. Plaintiff Fools Prayer Music, Inc. is one of the copyright

owners of and the administrator of various compositions the FAT BOYS perform, including all but one of the compositions listed in ¶ 16. *Id.* at ¶¶ 2–4.

Defendant Miller Brewing Co., Inc., manufactures and distributes beer. Defendant Backer & Spielvogel, Inc., is an advertising agency that creates commercials and advertising campaigns for Miller. Defendant Joe Piscopo is a comedian who appeared in the television commercial forming the subject matter of this suit.

The amended complaint alleges at ¶ 29: In 1987, defendants created, manufactured and arranged for the repeated broadcast of a 30–second commercial on prime-time television for Miller Beer featuring three FAT BOYS look-alikes performing in the distinctly FAT BOYS style described above (the "Commercial"). Miller and/or Backer & Spielvogel had contacted Morales, Wimbley and Robinson to appear in such a commercial as FAT BOYS, but the boys had declined. The Commercial has appeared repeatedly on national television, including in the State of New York, and in other media and continues to appear there.

The pleading contains detailed descriptions of the individual plaintiffs' physical appearance and dress while performing; the manner in which they perform; their youth; and the messages they seek by the lyrics of their songs to convey to youth: "to stay in school, to avoid all use of drugs or alcohol, and to abstain from sexual activity or to use contraceptive protection." ¶ 27; *see also* ¶¶ 22–26, 28.

In these circumstances, plaintiffs' amended complaint asserts nine claims against defendants. The first two allege copyright infringement, of musical compositions and sound recordings respectively, and are founded upon the federal Copyright Act. The third and fourth claims allege false advertising and unfair competition, and are founded on the federal Lanham Act. The fifth claim alleges unfair business practices, false advertising, and unfair competition under the New York General Business Law, §§ 349 and 350. The sixth claim alleges violation of plaintiffs' rights of privacy and publicity in respect of "look-alikes" under the New York Civil Rights Law, §§ 50 and 51. The seventh claim alleges comparable violations in respect of "use of sound-alikes". The eighth and ninth claims allege trade libel and disparagement, and libel *per se*, respectively.

Defendants move to dismiss all these claims under Rule 12(b)(6). I discuss them in the order in which they are pleaded.

## Discussion

I begin the analysis of defendants' motion to dismiss by recalling that on such a motion, the well-pleaded allegations of the complaint and all reasonable inferences therefrom must be considered as true. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 174–75, 86 S.Ct. 347, 348–49, 15 L.Ed.2d 247 (1965); *United States v. New Wrinkle, Inc.*, 342 U.S. 371, 376, 72 S.Ct. 350, 352, 96 L.Ed. 417 (1952). In short, on a motion to dismiss for failure to state a claim "the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Thus construed, a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) (footnote omitted).

### The Copyright Claims

Given these considerations, it is idle for defendants to argue on this motion that they have never "copied any of the copyrighted works in question." Reply Brief at 2. Plaintiffs allege that defendants copied parts of one or more of their copyrighted sound recordings, and composed and broadcast a melody substantially similar to one or more of plaintiff's compositions. The precise meaning of "one or more" may be explored on discovery, and plaintiff's have the burden of proof; but for purposes of the present motion, defendants concede

copying the Fat Boys' particular expression of rap music.

This does not end the inquiry. Defendants submit a copy of the television commercial in suit which the Court has examined. Defendants' main defense to the copyright claims characterizes the commercials as a "obvious parody of rap", constituting a "fair use which prevents a claim of copyright infringement." Main Brief at 6.

Whatever legal meaning "parody" may have in other contexts, cf. *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (application of First Amendment to magazine publisher's caricature of a public figure), in copyright law parody forms a part of the broader concept of fair use. Section 101 of the 1976 Copyright Act Revisions, 17 U.S.C. § 107, intended to be a codification of preexisting law, *MCA, Inc. v. Wilson*, 677 F.2d 180 (2d Cir.1981), provides in part that "the fair use of a copyrighted work ... for purposes such as criticism, comment, ... is not an infringement of copyright." The House Committee on the Judiciary reporting on the statute in H.Rep. No. 94–1476 (reprinted in West's U.S.C.A.1977 at 111–117), observes that the act gives "express statutory recognition for the first time" to the "judicial doctrine of fair use, one of the most important and well-established limitations on the exclusive right of copyright owners ..." A list of examples of fair use which the Committee derived from the Register's 1961 Report includes "use in a parody of some of the content of the work parodied ..."

In *Warner Bros., Inc. v. American Broadcasting, Inc.*, 720 F.2d 231, 242 (2d Cir.1983), the Second Circuit said:

> under the "fair use" doctrine, codified in 17 U.S.C. § 107(2) (Supp. V 1981), courts have allowed the taking of words or phrases when adapted for use as commentary or parody, *see, e.g., Elsmere Music, Inc. v. National Broadcasting Co.*, 623 F.2d 252 (2d Cir.1980) (per curiam); *Berlin v. E.C. Publications, Inc.*, 329 F.2d 541 (2d Cir.), *cert. denied*, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964).

The "parody" branch of the "fair use" doctrine is itself a means of fostering the creativity protected by the copyright law. It also balances the public interest in the free flow of ideas with the copyright holder's interest in the exclusive use of his work.

■ Parody, then, qualifies generally as fair use in copyright law. Whether a particular work qualifies as fair use requires consideration of the four elements § 107 goes on to recite:

> In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit education purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) The effect of the use upon the potential market for or value of the copyrighted work.

In the area of parody as copyright infringement, Second Circuit case law focuses first upon the general question—is the defendant's work truly a parody?—and then considers the four particular factors set forth in § 107(1)–(4).

Thus in *Elsmere Music, Inc. v. National Broadcasting Co.*, 482 F.Supp. 741 (S.D.N.Y.), *affirmed* 623 F.2d 252 (2d Cir.1989), upon which the present defendants rely, the alleged infringement arose out of a skit on the television program "Saturday Night Live" which, in the court of appeals' phrase, "pok[ed] fun at New York City's public relations campaign and its theme song." 623 F.2d at 253. That fun was poked by a parody of the copyrighted song "I Love New York" called "I Love Sodom." The district court summarized the nature and thrust of the parody:

> The song "I Love Sodom," as well as the sketch of which it was a part, was clearly an attempt by the writers and cast of SNL to satirize the way in which New York City has attempted to improve its

somewhat tarnished image through the use of a slick advertising campaign. 482 F.Supp. at 745.

District Judge Goettel rejected the plaintiff's argument that the song "I Love Sodom" and the sketch of which it was a part "did not constitute a valid parody of the 'I Love New York' advertising campaign." *Id.* at 746. Judge Goettel then said:

> Having found that SNL sketch and song validly parodied the plaintiff's jingle and the "I Love New York" advertising campaign in general, the Court next turns to the important question of whether such use has tended to interfere with the marketability of the copyrighted work.
>
> *Id.* at 747.

Judge Goettel answered that question in the negative and dismissed plaintiff's infringement action.

The Second Circuit affirmed *per curiam* "on Judge Goettel's thorough opinion", 623 F.2d at 253; but notwithstanding that thoroughness, was moved to append a footnote which reads as follows:

> The District Court concluded, among other things, that the parody did not make more extensive use of appellant's song than was necessary to "conjure up" the original. 482 F.Supp. at 747. While we agree with this conclusion, we note that the concept of "conjuring up" an original came into the copyright law not as a limitation on how much of an original may be used, but as a recognition that a parody frequently needs to be more than a fleeting evocation of an original in order to make its humorous point. *Columbia Pictures Corp. v. National Broadcasting Co.*, 137 F.Supp. 348, 354 (S.D. Cal.1955). A parody is entitled at least to "conjure up" the original. Even more extensive use would still be fair use, provided the parody *builds upon the original,* using the original as a known element of modern culture *and contributing something new for humorous effect or commentary.*
>
> (Emphasis added).

I perceive in that footnote a Second Circuit articulation of what a "valid parody" is. And I conclude that a work, clearly copied from a protected work (as I am bound to regard the defendants' work at bar) must be a *valid* parody if it is to qualify even for consideration as an example of fair use under § 107.

That conclusion is not inconsistent with *Berlin v. E.C. Publications*, 329 F.2d 541 (2d Cir.1964), the second case upon which present defendants rely. In *Berlin* the publishers of "Mad Magazine" put together a "collection of parody lyrics to 57 Old Standards which reflect the idiotic world we live in today." 329 F.2d at 543. So that the parody lyrics could be sung, they were written in the same meter as the original lyrics, as illustrated by the parody of "A Pretty Girl is Like a Melody": "Louella Schwartz Describes her Malady." The court of appeals affirmed dismissal of the original song publisher's claims of infringement. Judge Kaufman wrote:

> "The disparities in theme, content and style between the original lyrics and the alleged infringements could hardly be greater. In the vast majority of cases, the rhyme scheme of the parodies bears no relationship to the originals. While brief phrases of the original lyrics were occasionally injected into the parodies, this practice would seem necessary if the defendants' efforts were to "recall or conjure up" the originals; the humorous effect achieved when a familiar line interposed in a totally incongruous setting, traditionally a tool of parodists, scarcely amounts to a "substantial" taking, if that standard is not to be woodenly applied. Similarly, the fact that defendants' parodies were written in the same meter as plaintiffs' compositions would seem inevitable if the original was to be recognized, but such a justification is not even necessary; we doubt that even so eminent a composer as plaintiff Irving Berlin should be permitted to claim a property interest in iambic pentameter.
>
> *Id.* at 545.

The Second Circuit concluded its opinion in *Berlin* with these words:

> At the very least, where, as here, it is clear that the parody has neither the intent nor the effect of fulfilling the de-

mand for the original, and where the parodist does not appropriate a greater amount of the original work than is necessary to "recall or conjure up" the object of his satire, a finding of infringement would be improper.

*Ibid.*

The alleged copyright infringers in *Elsmere* and *Berlin* were a comedy television program and a comic magazine: both vehicles for the expression of that creative flow of ideas which the Second Circuit identified in *Warner Bros.* as the justification for the parody branch of the fair use doctrine. But there is ample authority for the proposition that appropriation of copyrighted material solely for personal profit, unrelieved by any creative purpose, cannot constitute parody as matter of law. Judge Leval reached that conclusion for this Court in *D.C. Comics v. Crazy Eddie*, 205 USPQ 1177 (S.D.N.Y.1979). The defendant produced and broadcast on local television channels a filmed commercial for his consumer electronic equipment which represented a "detailed copying" of plaintiff's copyrighted televised "trailers" for "Superman" television programs. Defendant argued that his commercial was a parody of the protected "Superman" work, relying as do defendants at bar upon *Berlin.* Judge Leval rejected the defense of a parody as fair use:

> Recognizing the validity of the proposition that parody is entitled to greater freedom than other uses, see *Berlin v. E.C. Publications, Inc.*, 329 F.2d 541, 141 USPQ 1 (2d Cir.1964), I find that defendant's commercial is not parody. This is not a case of fair use, but one of unjustifiable appropriation of copyrighted material for personal profit.
>
> 205 USPQ at 1178.

In *Warner Bros. v. American Broadcasting Companies, supra,* the Second Circuit expressly approved *D.C. Comics, Inc. v. Crazy Eddie, Inc.,* in an analysis which it is useful to quote at length:

> No matter how well known a copyrighted phrase becomes, its author is entitled to guard against its appropriation to promote the sale of commercial products.

That doctrine enabled the proprietors of the Superman copyright to prevent a discount chain from using a television commercial that parodied well-known lines associated with Superman. *D.C. Comics, Inc. v. Crazy Eddie, Inc.,* 205 U.S. P.Q. 1177 (S.D.N.Y.1979) ("Look! ... It's a bird! ... It's a plane ... It's ... Crazy Eddie!"). But an original work of authorship with elements of parody, though undoubtedly created in the hope of commercial success, stands on a different footing from the products of a discount chain. Whatever aesthetic appeal such a work may have results from the creativity that the copyright law is designed to promote. It is decidedly in the interests of creativity, not privacy, to permit authors to take well-known phrases and fragments from copyrighted works and add their own contributions of commentary or humor.

720 F.2d at 242 (footnote omitted).

It is worth noting that *D.C. Comics,* as interpreted by the Second Circuit in *Warner Bros.,* did not involve the sale by defendant of products which competed with plaintiff's product. The Crazy Eddie electronics discount chain did not compete in any fashion with the plaintiff's Superman comic books and filmed television productions. No matter: the parody as fair use defense failed because defendant's use of appropriated copyrighted material "to promote the sale of commercial products" simply did not qualify as parody.

*Original Appalachian Artworks v. Topps Chewing Gum,* 642 F.Supp. 1031 (N.D.Ga.1986), reaches the same result, although within the context of the first element specified in § 107, namely, "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes ..." In *Topps* the defendant, a chewing gum manufacturer, began distributing "Garbage Pail Kids" stickers and chewing gum cards. Plaintiff, a marketer of dolls under the copyright and trademark "Cabbage Patch Kids", brought an action for copyright and trademark infringement. The defendant argued fair use under the

Copyright Act on the basis of parody. The District Court rejected the parody defense because "the primary purpose behind defendant's parody is not an effort to make a social comment but is an attempt to make money." The court continued:

> Neither are the Garbage Pail Kid stickers merely one of a series of spoofs of various different products, as defendant has produced in the past, nor a single cartoon or editorial in a broader satirical product such as Mad Magazine. The basic concept behind the defendant's stickers is aimed at capitalizing on the Cabbage Patch craze.

642 F.Supp. at 1034.

In a case where plaintiff and defendant competed in the entertainment field, the Second Circuit stressed defendants' commercial purposes in rejecting a fair use defense based on parody:

> The district court held that defendants' song was neither a parody or burlesque of Bugle Boy nor a humorous comment on the music of the '40's. [*MCA, Inc. v. Wilson*] 425 F.Supp. [443] 453 [S.D.N.Y. 1976]. We are not prepared to hold that a commercial composer can plagiarize a competitor's copyrighted song, substitute dirty lyrics of his own, perform it for commercial gain, and then escape liability by calling the end result a parody or satire on the mores of society. Such a holding would be an openended invitation to musical plagiarism. We conclude that defendants did not make fair use of plaintiff's song.

*MCA, Inc. v. Wilson*, 677 F.2d 180, 185 (2d Cir.1981).

The Supreme Court in two recent cases has emphasized commercial purpose as a factor militating against fair use. *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417, 451, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984) ("... although every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of a copyright, noncommercial uses are a different matter.") (held, non-commercial home use recording of material broadcast over the public airways was a fair use of copyrighted works

and did not constitute copyright infringement); *Harper & Row v. Nation Enterprises*, 471 U.S. 539, 562, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985) (quoting the above language from *Sony* and adding: "the crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.") (article in *The Nation* using generous verbatim excerpts of President Ford's unpublished expression to lend authenticity to his account of his forthcoming memoirs constituted an arrogation of the right of first publication and was not a "fair use" sanctioned by § 107 of the Copyright Act).

■ In *D.C. Comics*, Judge Leval did not feel it necessary to analyze the four "fair use" factors specified in § 107. He simply concluded that the television commercial could not qualify as a fair use parody because it was nothing more than an unjustifiable appropriation of copyrighted material for personal profit. The other cited cases engage in a more detailed § 107 analysis. I do not think it makes any difference here, since in either event defendants' commercial does not qualify as parody. The commercial's use is entirely for profit: to sell beer. Even if the concept of parody is impermissibly stretched to include this commercial, it does not qualify as fair use, since accepting the pertinent allegations of the complaint as true, the commercial in no manner "builds upon the original," nor does it contain elements "contributing something new for humorous effect or commentary." *Elsmere, supra.*

An additional factor militating against fair use emerges from plaintiff's pleading. A court may consider "whether the paraphrasing and copying was done in good faith or with evasive motive." *MCA, Inc. v. Wilson, supra,* at 183. Plaintiffs allege that defendants Miller and its advertising agency had contacted plaintiffs Morales, Wimbley and Robinson to appear in such a commercial but they had declined. Subsequently defendants put together the commercial in suit, using look-alikes of the individual plaintiffs as background per-

formers for Piscopo. Accepting as I must on this motion the truth of all reasonable inferences to be drawn from the complaint's factual allegations, it requires no effort to infer that, having been rebuffed by plaintiffs for such a commercial, defendants Miller and Backer proceeded to copy them. The finders of the fact could equate such conduct with bad faith and evasive motive on defendants' part.

Defendants insist that the complaint does no more than allege violation by the commercial of "the style of rap music as performed by the Fat Boys," and contend that "[t]he copyright laws do not give a registrant exclusive ownership and control over an entire jenre music." Reply Brief at 4. On this motion, however, I must accept as true plaintiffs' allegations that the commercial infringes both copyrighted compositions, ¶ 36, and copyrighted sound recordings, ¶ 42.

Defendants' motion to dismiss the copyright claims is denied.

### The Trademark Claims

■ The complaint alleges that plaintiffs Morales, Wimbley and Robinson adopted the name FAT BOYS to identify their musical performing group, and that on application of plaintiff Tin Pan Apple, Inc., that name was registered on the principal register in the United States Patent and Trademark Office. The complaint further alleges that Tin Pan Apple and the individual plaintiffs have entered into license agreements for the use of the name FAT BOYS for products such as clothing and toys; that the group has achieved commercial success and established good will associated with the name of FAT BOYS as a singing group; that the individual plaintiffs' "unique musical and performance style" has caused their name and service mark to become associated in the public mind "with a certain style of performance, type of music and message to be delivered by the music"; and that the public associates the individual plaintiffs "specifically with FAT BOYS in their recognizable personae of overweight, young singers who create a melody for their songs by vocal sounds rather than instruments and who consist-

ently appear before the public wearing square studded eyeglasses, T-shirts, stripped sneakers, satin baseball jackets and large, gold name pendants around their necks." ¶¶ 45–49. Defendants' commercial is alleged to represent a deliberate attempt to misrepresent, mislead and confuse the public and customers of plaintiff's products and services into falsely believing:

> 1) that defendants' Commercial for a Miller-brand beer is performed by Morales, Wimbley and Robinson as FAT BOYS; 2) that defendants' Commercial for a Miller-brand beer is performed by Morales, Wimbley and Robinson as FAT BOYS in conjunction with and as back-up musical vocals to defendant Piscopo; 3) that Morales, Wimbley and Robinson, as FAT BOYS, endorse the drinking of beer and, specifically, the Miller product.

The complaint further alleges the particular physical characteristics and performance styles of the individual plaintiffs, and the manners in which the participants in the commercial closely resemble those characteristics and styles. ¶¶ 22–26, 30–31. Jurisdiction over the trademark claims is predicated on the Lanham Act, 15 U.S.C. §§ 1114, 1125(a).

Defendants argue that there is no substantial similarity between the performance depicted on the commercial and the performance of the Fat Boys, and hence no likelihood of consumer confusion. But I must take the complaint's factual allegations as true, and there is no basis for concluding on the pleadings that plaintiffs do not have a viable claim on this element.

Defendants again rely upon the defense of parody. The Second Circuit recognizes parody as a defense to a Lanham Act claim. Indeed, in *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing, Inc.*, 886 F.2d 490 (2d Cir.1989), the court upheld that defense and reversed the district court's preliminary injunction. The publisher of a college study guide, "Cliffs Notes", brought an action alleging that a cover of a parody, "Spy Notes", would give consumers the false impression that the parody was the study guide publisher's product. Defendant said that its product

was a permissible parody. Judge Feinberg's opinion starts with the proposition "that parody is a form of artistic expression, protected by the First Amendment." [1] 886 F.2d at 493. At the same time, the court recognized that "[t]rademark protection is not lost simply because the allegedly infringing use is in connection with a work of artistic expression, *ibid.*, citing and quoting *Silverman v. CBS, Inc.*, 870 F.2d 40, 49 (2d Cir.), *cert. denied* —— U.S. ——, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989). The Second Circuit then said in *Cliffs Notes:*

> Conflict between these two policies is inevitable in the context of parody, because the key stone of parody is imitation. It is hard to imagine, for example, a successful parody of Time magazine that did not reproduce Time's trademarked red border. A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is *not* the original and is instead a parody. To the extent that it does only the former but not the latter, it is not only a poor parody but also vulnerable under trademark law, since the customer will be confused.

*Id.* at 494

Relying upon its prior analysis in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir.1989), and observing that "the expressive element of parodies requires more protection than the labeling of ordinary commercial products," *Id.* at 495, the Second Circuit concluded in *Cliff's Notes* that the public interest in free expression and parody outweighed the slight risk of consumer confusion between the covers of the two publications.

For essentially the same reasons stated in connection with plaintiff's copyright claims, I decline to recognize defendants' commercial as parody. Accordingly that defense fails again.

▉ A copyright claim is made out when defendant copies the protected work without the defense of fair use (such as

parody). There is an additional element to a trademark claim. "The heart of a successful claim based upon §§ 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), and common law trademark infringement is the showing of likelihood of confusion as to the source or sponsorship of defendant's products." *Standard & Poor's Corp. v. Commodity Exchange*, 683 F.2d 704, 708 (2d Cir.1982). In this circuit courts consider six primary (although not exclusive) factors in deciding the issue of likelihood of confusion: (1) the strength of plaintiff's marks and name; (2) the similarity of plaintiff's and defendant's marks; (3) the proximity of plaintiff's and defendant's products; (4) evidence of actual confusion as to source or sponsorship; (5) sophistication of the defendant's audience; and (6) defendant's good or bad faith. *Standard & Poor's Corp., supra*, at 708; *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

On this aspect of the case at bar, Judge Motley's opinion in *Allen v. National Video, Inc.*, 610 F.Supp. 612 (S.D.N.Y.1985), is instructive. The plaintiff was the celebrity Woody Allen. Defendant National, the owner of a nationally franchised video rental chain, hired defendant Ron Smith Celebrity Look–Alikes to find an individual closely resembling Allen (the defendant Boroff), who defendant then used in a pictorial advertisement. Judge Motley granted plaintiff summary judgment on his trademark claim and a nationwide injunction. In a "look-alike" case, the court in *Allen* equated the first factor to "the extent to which plaintiff has developed a favorable association for his mark in the public's mind"; "mark" in this context consisting of the plaintiff's name and likeness. The second element, similarity of the "marks", reflects the similarity of plaintiff to the individual or individuals used by defendant.

---

1. The effect of that proposition in the case at bar is problematic, since "[t]he Constitution ... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson Gas & Electric v. Public Service Commission of New York*, 447

U.S. 557, 562–63, 100 S.Ct. 2343, 2349–50, 65 L.Ed.2d 341 (1980). It is easier to characterize the parody involved in *Cliff's Notes* as "a form of artistic expression" than defendants' beer commercial at bar.

As to the third factor, proximity of the products, the court in *Allen* observed that while plaintiff did not own a video rental chain, he was involved in producing and distributing his own motion pictures, and was "strongly identified with movies in the public mind." *Id.* at 628. Judge Motley also noted that "[t]here is no requirement under the Act that the plaintiff and the defendant actually be in competition", *ibid,* citing *James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266 (7th Cir.1976).

■ Evidence of actual confusion, the fourth factor, "although highly probative of likelihood of confusion, is not required." *Ibid.*[2] As to the fifth factor, sophistication of the defendant's audience, the court in *Allen* reasoned that the average customer of National Video, or reader of the magazine "Video Review" (in which defendants' advertisement appeared) were "likely to be comparatively sophisticated about movies ..." Nonetheless, the court concluded, "given the close resemblance between defendant Boroff's photograph and plaintiff, there is no reason to believe that the audience's relative sophistication eliminates all likelihood of confusion; at a cursory glance, many consumers, even sophisticated ones, are likely to be confused." *Ibid.*

On the final factor, the good or bad faith of defendant, Judge Motley properly observed that where a defendant designs an advertisement intentionally to evoke an association with a plaintiff, they "must therefore at least have been aware of the risk of consumer confusion, which militates against a finding that their motives were completely innocent."

■ Turning from this useful "look-alike" case to the one at bar, I must first observe that the present *motion is not that* of plaintiff for summary judgment (which Judge Motley granted in *Allen* ). Rather, defendants move to dismiss the complaint; and the standard is that of Rule 12(b)(6). Under the familiar principles discussed *supra,* the first and second factors—the strength of the plaintiffs' "marks" and name and the similarity of plaintiffs' and defendants' marks—are sufficiently alleged in the amended complaint and must be taken as true. The third factor, proximity of the products, which necessarily implicates consideration of the relevant market, suggests some differences: presumably not all devotees of rap music also drink beer. But it seems safe to assume that many of them do, and this factor is satisfied if there is a sufficient "intersection" of the audience involved. *Allen v. Men's World Outlet, Inc.,* 679 F.Supp. 360, 368 (S.D.N.Y.1988).

As to actual confusion, the purpose of a Rule 12(b)(6) motion is not to seek out the sufficiency of evidence. In any event such evidence is not required to state a claim.

The fifth factor, sophistication of the defendant's audience, militates in plaintiffs' favor. The populations involved are individuals who watch performances of rap music and individuals who drink beer. Defendants cast wide nets. One cannot assume so great a degree of sophistication as to negate likelihood of confusion.

Given the factual allegations of the complaint, the sixth factor, defendants' bad faith, also militates strongly in favor of plaintiffs' claim. Indeed, the case is stronger for plaintiffs in that regard than *Allen v. National Video, Inc.* In that case, Judge Motley regarded defendants' motives as dubious when they deliberately procured a Woody Allen look-alike, even though there had been no prior communications with Allen about the advertisement in question. Plaintiffs at bar allege that defendants asked them to participate in a Miller Beer television commercial, they refused, and defendants then procured the look-alikes. That is bad faith raised to a higher power. A comparable course of conduct was characterized in *Midler v. Ford Motor Co.,* 849 F.2d 460, 462 (9th Cir.1988), as that "of the average thief."

---

2. That is the rule in respect of a demand for injunctive relief (as in *Allen*). Plaintiffs at bar seek, *inter alia,* injunctive relief. A trademark plaintiff must prove actual confusion to recover money damages. *PPX Enterprises v. Audiofidelity Enterprises,* 818 F.2d 266, 271 (2d Cir.1987).

Plaintiff's trademark claims survive Rule 12(b)(6) challenge. Defendants' motion to dismiss these claims is denied.

### The Unfair Competition Claims

I do not understand defendants to challenge separately the legal sufficiency of plaintiffs' allegations of unfair business practices, false advertising, and unfair competition under §§ 349 and 350 of the New York General Business Law (fifth claim of the amended complaint). This claim is governed by the same considerations discussed *supra*, and defendants' motion to dismiss it is denied.

### The Rights of Privacy and Publicity Claims—"Look–Alikes"

■ Plaintiffs' sixth claim is based upon §§ 50 and 51 of the New York Civil Rights Law, whose provisions appear in the margin.[3] In essence, the individual plaintiffs claim that after they refused to make a television commercial for Miller and its advertising agency, defendants "publicly advertised for three fat Black males to appear in a commercial," and that the males appearing in the commercial in suit (exclusive of Piscopo) "bear a striking resemblance to and are look-alikes of each of the three 'fat Black males' constituting the Fat Boys." Amended Complaint ¶ 64.

Sections 50 and 51 of the Civil Rights Law "are penal in part, and should be construed accordingly," *Lombardo v. Doyle, Dane & Bernbach, Inc.*, 58 A.D.2d 620, 396 N.Y.S.2d 661, 663 (2nd Dept.1977). Ordinarily plaintiffs' "names, portraits, or pictures" must be used by a defendant to state a claim under §§ 50 and 51. *Wojtowicz v. Delacorte Press*, 43 N.Y.2d 858, 403 N.Y.S.2d 218, 374 N.E.2d 129 (1978). The Civil Rights Law "is to be strictly construed and is not to be applied so as to

prohibit the portrayal of an individual's personality or style of performance." *Lombardo, supra*, at 664, 396 N.Y.S.2d 661.

Notwithstanding these general principles, there is also authority for the proposition that a defendant's deliberate seeking out and use of as close a look-alike as possible to the plaintiff falls within the ban of the statute, even if the plaintiff's name is not used. In *Onassis v. Christian Dior-New York, Inc.*, 122 Misc.2d 603, 472 N.Y.S.2d 254 (Sup.Ct., Cty.1984), *aff'd.*, 110 A.D.2d 1095, 488 N.Y.S.2d 943 (1st Dept. 1985), defendant manufacturer retained the ubiquitous Ron Smith Celebrity Look–Alikes to find a model closely resembling Mrs. Jacqueline Kennedy Onassis to use in a pictorial advertisement, knowing full well that Mrs. Onassis would not consent to pose herself. While recognizing the requirement that the Civil Rights Law, "being in derogation of common law, receive a strict, if not a literal construction", 472 N.Y.S.2d at 258, the court went on to say:

> However, "since its purpose is remedial ... 'to grant recognition to the newly expounded right of an individual to be immune from commercial exploitation' [*Flores v. Mosler Safe Co.*, 7 N.Y.2d 276, 280–281 [196 N.Y.S.2d 975, 164 N.E.2d 853]; see *Lahiri v. Daily Mirror*, 162 Misc. 776, 779 [295 N.Y.S. 382]), section 51 of the Civil Rights Law has been liberally construed over the ensuing years." *Stephano v. New Group Publications, Inc.*, 98 A.D.2d 287, 295, 470 N.Y.S.2d 377 (First Dept., 1984).
> *Ibid.*

The court granted Mrs. Onassis a preliminary injunction against publication of the ad, distinguishing *Lombardo, supra*, on

---

**3.** § 50 provides:

A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor

§ 51 provides in pertinent part:

Any person whose name, portrait or picture is used within this state for advertising purposes or for the purpose of trade without the written

consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner as is forbidden or declared to be unlawful by the last section, the jury, in its discretion, may award exemplary damages.

the ground that the actor impersonating the plaintiff bandleader "did not physically resemble the plaintiff." *Id.* 472 N.Y.S.2d at 260. The court stated further:

> The essence of what is prohibited, as the statute, the cases, and the dictionary definitions make clear, is the exploitation of one's identity as that is conveyed verbally or graphically. A photograph may be a depiction only of the person before the lens, but a "portrait or picture" gives wider scope, to encompass a representation which conveys the essence and likeness of an individual, not only actuality, but the close and purposeful resemblance to reality. That is how it was defined in *Binns v. Vitagraph Co. of America,* supra, as any representation, including the picture of another, which was intended to be, and did, in fact, convey the idea that it was the plaintiff.
>
> *Id.* at 261.

*Binns v. Vitagraph Co. of America,* 210 N.Y. 51, 103 N.E. 1108 (1913), cited by the *Onassis* court, held that the use of an actor to represent plaintiff, a heroic wireless operator within the public eye in a photoplay violated the statute. The New York Court of Appeals said:

> "A picture within the meaning of the statute is not necessarily a photograph of the living person, but includes any representation of such person. The picture ... was intended to be, and it was, a representation of the plaintiff."
>
> *Id.* at 57, 103 N.E.2d at 1114.

In *Allen v. National Video, Inc., supra,* involving the Woody Allen look-alike, Judge Motley decided the case under § 43(a) of the Lanham Act. However, in the context of § 51 of the Civil Rights Law she cited *Onassis* for the proposition that "an exact duplication of plaintiff was not necessary to make out a cause of action under the statute, so long as the overall impression created clearly was that plaintiff had herself appeared in the advertisement," and went on to say:

> When, as in *Onassis,* the look-alike seems indistinguishable from the real person and the context of the advertisement clearly implies that he or she is the

real celebrity, a court may hold as a matter of law that the look-alike's face is a "portrait or picture" of plaintiff.

610 F.Supp. at 623.

I conclude that for Rule 12(b)(6) purposes the amended complaint states a viable claim under §§ 50 and 51 of the New York Civil Rights Law. Defendants correctly observe that the present record includes no photographs, videos or other depictions of the individual plaintiffs from which an evaluation of physical resemblance may be made. Thus decision at this stage of the case does not preclude a motion by defendants for summary judgment on a more complete record. But the complaint's allegations of physical similarity, which I must accept as true, state a claim, given the cited cases' recognition that close resemblance in certain circumstances may violate the statute.

Defendants' motion to dismiss the §§ 50 and 51 claims based on "look-alikes" is denied.

### The Rights of Privacy and Publicity Claims—"Sound–Alikes"

█ In their seventh claim, plaintiffs invite this Court to "correct" an "oversight" of the New York Legislature and hold that defendants' use of sound-alikes of their voices violates §§ 50 and 51. I decline the invitation.

The statute extends the right of privacy to an individual's "name, portrait or picture ..." It is one thing to regard a close physical resemblance as the functional equivalent of a picture; that is the thrust of the cases cited in the preceding section. The same sense, that of vision, is involved. It is quite a different proposition to bring the sense of sound within the statute when the legislature has so far declined to do so. That is not an appropriate judicial function.

In *Lahr v. Adell Chemical Co.,* 300 F.2d 256 (1st Cir.1962), the First Circuit construed the New York statute in holding that defendant's copying of the comedian Bert Lahr's distinctive voice in a commercial featuring a cartoon duck did not state a claim. Judge Aldrich observed that the statute covered only commercial use of a

party's "name, portrait or picture," adding: "The statute is very specific." *Id.* at 258. Plaintiffs at bar point out that *Lahr* did not involve combined use of look-alikes and sound-alikes, but that seems to me a distinction without a difference. It is still a legislative function to decide whether copying a party's voice violates the statute in any circumstance. Plaintiffs cite *Midler v. Ford Motor Co.*, 849 F.2d 460 (9th Cir. 1988), but the case does not assist them. True enough, Ford and its advertising agent asked the noted popular singer Bette Midler to make a commercial and, upon her refusal, hired a singer who sounded like her: conduct comparable to that alleged against defendants at bar. The commercial did not use Midler's name or picture, but the Ninth Circuit, construing California law, articulated a cause of action for commercial use of a sound-alike. The court of appeals derived from California statutes protecting use of a person's "name, *voice*, signature, photograph or likeness" comparable common law rights which by analogy also constituted "property rights," *id.* at 463 (emphasis added); defendants were held to have misappropriated Midler's property and thus committed a tort under California law. I do not presume to comment on the Ninth Circuit's exegesis of the law of another state. I hold only that the New York Civil Rights Law does not yet extend to sound-alikes.

It does not follow that resemblances in sound between the Fat Boys' performances and the commercial are not probative of any issues in the case. Similarity of sound in combination with similarity of appearance may militate in favor of plaintiffs' other claims, just as defendants would be assisted if the individuals appearing with Piscopo in the commercial looked like the Fat Boys but sounded like the Vienna Boys' Choir. But plaintiffs' sound-alike claim does not state a separate cause of action under the Civil Rights Law. Accordingly defendants' motion to dismiss that claim under Rule 12(b)(6) is granted.

*The Defamation Claims*

In response to defendants' motion to dismiss the complaint, plaintiffs amended the complaint in respect of their defamation claims. The eighth claim alleges product disparagement. The commercial is alleged to constitute a false representation that the individual plaintiffs approve of and solicit orders for an alcoholic beverage, although they are under the legal drinking age as specified by the New York Alcoholic Beverage Control Law, § 126. The individual plaintiffs are alleged to "have suffered damages and injury to their business reputations from this presentation of their images." As "special damages'" plaintiffs allege they "have lost customers including a tour sponsorship from Coca–Cola, Inc.", that "plaintiffs' customers have been deterred from pursuing negotiations with plaintiffs because of the false association of the FAT BOYS with the Miller beer product'" and that plaintiffs "have suffered specific pecuniary loss and injury to their business thereby." ¶¶ 71–77.

The ninth claim alleges libel per se in that the commercial suggests "that plaintiffs Morales, Wimbley and Robinson would engage in illegal activity," namely, endorsing the drinking of and soliciting orders for the purchase of an alcoholic beverage in violation of § 126 of the Alcoholic Beverage Control Law. ¶¶ 79–83.

Defendants contend that neither claim states a viable cause of action for defamation. I agree.

Whether we deal with libel per se or libel per quod, it is for the court to say as a preliminary question of law whether there is a reasonable basis for drawing the defamatory conclusion alleged by plaintiffs. "The language will be given a fair reading and the court will not strain to place a particular interpretation" on defendant's utterances. *James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 420–21, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976). Assuming plaintiffs pass that threshold inquiry, they must allege special damages unless defendants' commercial constitutes libel per se. *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 380, 397 N.Y.S.2d 943, 366 N.E.2d. 1299 (1977).

Plaintiffs at bar do not pass the threshold inquiry. There is no basis from which

the ordinary viewer of the commercial could draw an inference that the individual plaintiffs were underage and, in violation of the state statute, were endorsing or soliciting the consumption of alcoholic beverages by minors. Assuming *arguendo* that the three look-alikes in the commercial so closely resembled plaintiffs that viewers thought they were watching plaintiffs, the commercial nowhere states the ages of the participants, and it is assuming too much of ordinary viewers that they knew plaintiffs were under twenty-one years of age. Moreover, the statute cited by plaintiffs as the underpinning for their defamation claims does not proscribe the conduct depicted in the commercial. § 126(2) and (3) of the Alcoholic Beverage Control Law provide that a person under the age of twenty-one years is "forbidden to traffic in alcoholic beverages ..." § 3(30) provides: "'Traffic in' includes to manufacture and sell any alcoholic beverage at wholesale or retail." § 3(28) provides:

> Sale means any transfer, exchange or barter in any manner or by any means whatsoever for a consideration, and includes and means all sales made by any person, whether principal, proprietor, agent, servant or employee of any alcoholic beverage and/or a warehouse receipt pertaining thereto. "To sell" includes to solicit or receive an order for, to keep or expose for sale, and to keep with intent to sell and shall include the delivery of any alcoholic beverage in the state.

The conduct depicted in the commercial cannot be regarded as the manufacture or sale of beer, or trafficking in alcoholic beverages, as those words are defined in the statute.

Nor, on the eighth claim, have plaintiffs sufficiently alleged special damages, a necessary element in libel per quod. *See Harwood Pharmacal Co., Inc. v. National Broadcasting Co., Inc.,* 9 N.Y.2d 460, 214 N.Y.S.2d 725, 174 N.E.2d 602 (1961); *Drug Research Corp. v. Curtis Publishing Co.,* 7 N.Y.2d 435, 199 N.Y.S.2d 33, 166 N.E.2d 319 (1960) (claim of libel on the product dismissed for failure to allege special damages with requisite specificity); *Cambridge*

*Associates v. Inland Vale Farm Company,* 116 A.D.2d 684, 497 N.Y.S.2d 751 (2d. Dept.1986) (same).

What I have said concerning plaintiffs' claim for libel per quod is sufficient to dispose of their claim for libel per se. An utterance is libelous and actionable without alleging special damages "if it tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Rinaldi, supra,* 42 N.Y.2d at 380, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (citing and quoting *Sydney v. MacFadden Newspaper Pub. Co.,* 242 N.Y. 208, 211–12, 151 N.E. 209, 212–13 (1926). Again, plaintiffs assert a perceptible violation by them of the Alcohol Beverage Control Law. There is none.

Defendants' motion to dismiss plaintiffs' eighth and ninth claims is granted.

### Defendants' Alternative Claims for Relief

In the alternative, defendants pray for a more definite statement on the copyright claims under Rule 12(e), and to strike certain allegations in the complaint under Rule 12(f). Both motions are denied.

Rule 12(e) concerns the overall intelligibility of a pleading, not its evidentiary detail. Plaintiffs' allegations of copyright infringement are sufficiently precise to place defendants on notice of the nature of the claim. Defendants may develop additional details—for example, which musical compositions and sound recordings defendants are alleged to have infringed—through customary pre-trial discovery.

Defendants' motion to strike under Rule 12(f) is denied because the allegations in question concern arguably relevant background facts.

### Conclusion

Defendants' motion to dismiss the complaint for failure to state claims upon which relief can be granted is granted as to the Seventh, Eighth, and Ninth claims. Those claims are dismissed with prejudice.

Defendants' motion is denied in all other respects.

Discovery and preparation for trial will be supervised by a Magistrate in accordance with an Order previously entered.

It is SO ORDERED.