**SIGNODE CORPORATION, Plaintiff-Appellant,**

v.

**WELD–LOC SYSTEMS, INC. and Strapex AG, Defendants-Appellees.**

No. 82–2025.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1982.

Decided Feb. 23, 1983.

John P. Milnamow, Dressler, Goldsmith, Shore, Sutker, & Milnamow, Ltd., Chicago, Ill., for plaintiff-appellant.

Richard G. Lione, Hume, Clement, Brinks, Willian & Olds, Ltd., Chicago, Ill., for defendants-appellees.

Before ESCHBACH and COFFEY, Circuit Judges, and WISDOM,* Senior Circuit Judge.

ESCHBACH, Circuit Judge.

Signode Corporation ("Signode") appeals from the district court's denial of its motion for a preliminary injunction in a patent infringement case. For the reasons below, we affirm.

I

Signode has been manufacturing tools for friction welding plastic strapping since

---

* The Honorable John M. Wisdom, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

1966. Signode is the owner of United States Patent Nos. 3,442,732 and 3,442,735, issued in 1969, which define the friction weld process and the apparatuses used in the process. The process, known as "Tension-Weld," involves overlapping the ends of plastic strapping, forcing the ends together under pressure while moving them against each other to cause the plastic to become molten, then ceasing the movement to allow the plastic to re-solidify, forming a joint between the two ends. This process is accomplished by hand tools, one of which Signode sells for approximately $985.00. Signode also sells unpatented plastic tape for use with its tools. ·

Appellee Weld-Loc Systems, Inc. ("Weld-Loc") is an Ohio corporation with 900 shares of stock outstanding. Appellee Strapex AG owns 500 of these shares. Strapex AG, a Swiss corporation, manufactures a hand tool for friction welding plastic strips known as the Strapex Model 361 Vibratory Sealing Tool ("Strapex Model 361"). Strapex AG was selling the Model 361 in Europe as early as 1976 or 1977. In 1976, Richard A. Wolschlag, President of Weld-Loc, asked Signode for a license under one of its patents so that Weld-Loc could sell the Strapex Model 361 in the United States. Signode refused to grant a license.

In September 1980, Strapex Corporation, a wholly owned subsidiary of Appellee Weld-Loc, began marketing the Strapex Model 361 in the United States. Signode became aware of this shortly thereafter. At the time of the hearing before the magistrate, Weld-Loc, itself or through Strapex Corporation, had sold three to four hundred of these tools for a price of approximately $1,350.00 each.

Signode brought a patent infringement suit against Strapex Corporation in May 1981 in Florida. In December 1981, Signode brought this suit against Weld-Loc and Strapex AG in the Northern District of Illinois, charging patent infringement, and moved for a preliminary injunction. With the consent of both parties, the motion was referred to a magistrate, according to 28 U.S.C. 636(b)(1). The magistrate conducted an evidentiary hearing, submitted proposed findings of fact and conclusions of law, and recommended that the preliminary injunction be denied because of Signode's failure to establish irreparable harm. The district court adopted the magistrate's Report and Recommendations and denied Signode's motion for a preliminary injunction. Signode appeals.

## II

Signode raises several issues on appeal. First, Signode contends that the district court erred in failing to make a de novo determination of the portions of the magistrate's report to which objections were made. Signode next asserts that the magistrate and the district court erred in concluding that Signode had not established irreparable harm. Signode argues that irreparable harm would occur in the absence of a preliminary injunction because Weld-Loc and Strapex AG would be financially unable to respond in damages if their activities are allowed to continue until trial on the merits and because Signode would be forced to bring a multitude of suits against the would-be customers of Weld-Loc and Strapex AG to enjoin all of them from using Signode's patented process.[1]

## III

### A. The Necessity of a De Novo Determination

Under 28 U.S.C. 636(b)(1), a district court judge may refer certain pretrial matters to a magistrate for a determination that will be reconsidered only if the magistrate's order is clearly erroneous or contrary to law. Other matters, including motions for in-

---

1. Additionally, the appellees have moved to strike an affidavit submitted by Signode and portions of Signode's brief on the grounds that the affidavit is not properly part of the appellate record and Signode's brief impermissibly refers to it. We need not decide this issue because we would affirm the district court's decision denying Signode a preliminary injunction even if the affidavit and the contested portions of the brief are considered and the factual allegations contained therein are taken as true.

junctive relief, can be referred to the magistrate for a determination that will be subject to de novo determination. The district judge is required to make a determination of any portion of the magistrate's findings or recommendations to which objection is made. Both parties correctly recognize that Signode's motion for a preliminary injunction was subject to the district court's de novo review. There is nothing in the record to indicate that Signode waived a de novo determination.

In its opinion, the district court stated that the magistrate's findings of fact were not clearly erroneous, but then proceeded to set out what appears to be its own findings of fact, made after a "careful review of the record." We therefore cannot state with certainty which standard of review the district court was applying. However, the determination of the propriety of a preliminary injunction in this case depends entirely on the resolution of legal issues. The facts regarding the appellees' financial condition are not seriously disputed; and, as will become apparent, resolving all the other factual issues in favor of Signode still does not establish irreparable harm if the legal issues are decided in favor of the appellees. Because the resolution of the legal issues dictates denial of the preliminary injunction on the record before us,[2] the standard of review that the district court used to review the magistrate's factual determinations, if incorrect, would not affect our affirmance of the denial.

## B. The Prerequisites of Preliminary Injunctive Relief

■ A court's discretion in granting or denying preliminary injunctive relief must be guided by consideration of four factors: whether the plaintiff will be irreparably harmed in the absence of a preliminary injunction, whether the threatened injury to the plaintiff outweighs the harm an injunction may inflict on the defendant, whether the plaintiff has at least a reasonable likelihood of success on the merits, and whether granting a preliminary injunction will disserve the public interest. *O'Conner v. Board of Education,* 645 F.2d 578, 580 (7th Cir.), *cert. denied,* 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981); *Fox Valley Harvestore v. A.O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1097 (7th Cir.1976). A preliminary injunction is an extraordinary remedy, available only to plaintiffs who carry the burden of persuasion as to all four factors. *Id.* at 1097. As a general rule, "a defendant's ability to compensate plaintiff in money damages precludes issuance of a preliminary injunction." *Nuclear-Chicago Corp. v. Nuclear Data, Inc.,* 465 F.2d 428, 430 (7th Cir.1972); *see. also Sinko Tool & Mfg. Co. v. Casco Products Corp.,* 89 F.2d 916, 921 (7th Cir.1937); *Artmoore Co. v. Dayless Mfg. Co.,* 100 F.Supp. 110, 111 (N.D.Ill.1951).

## C. Appellees' Ability to Respond in Damages

Signode claims that, in the absence of a preliminary injunction, it will suffer irreparable harm because Weld-Loc and Strapex AG would be unable to pay the damages that will have accumulated by the time this case is decided on the merits.[3] The resolution of this issue depends on two factors—the appellees' resources and the potential magnitude of eventual damages.

Although Signode made some minor objections to the magistrate's proposed findings of fact regarding the financial condi-

---

**2.** Under 28 U.S.C. § 636(b)(1), a district court making a de novo determination of a magistrate's findings may receive further evidence. The parties, however, apparently have nothing to add to the record they have established below. At oral argument, attorneys for both appellant and appellees stated that this court is in as good a position to conduct a de novo review of the magistrate's determinations as the district court would be. While we have not found it necessary to conduct such a review because

resolution of this case turns on legal issues, we interpret these remarks at oral argument to indicate satisfaction with the factual record as it now stands, eliminating the necessity for remand for possible presentation of further evidence.

**3.** Signode does not allege that its own business will be irreparably harmed by appellees' competition if a preliminary injunction does not issue.

tion of the appellees, the general financial picture is undisputed. For calendar year 1980, Strapex AG had annual sales of $20,-500,000, after tax profit of $1,050,000, and a net worth of $8,648,606.30.[4] Additionally, Strapex AG had available $1,600,000 in an unused line of credit. The only asset Strapex AG had in the United States was its shares in Weld-Loc. For calendar year 1981, Weld-Loc had total sales of $15,000,-000 and a net worth of $6,543,851. Testimony indicates that Weld-Loc could satisfy a judgment of $500,000 from its present line of credit, $1,000,000 by selling certain of its assets, and $2,000,000 by selling a Canadian subsidiary. Weld-Loc has an indemnification agreement from Strapex AG for any Strapex AG equipment sold in the United States. There is no indication that either Weld-Loc or Strapex AG will financially deteriorate during the pendency of this action.

The real point of controversy is the magnitude of potential damages. The appellees would like to limit damages to a reasonable royalty, using the license agreement between Signode and its only licensee, Titan, a German company, as a reference. If not limited to royalties, the appellees would limit damages to the profits Signode lost due to the competition from the Strapex Model 361. Signode, on the other hand, would like to recover damages for the profits lost due to decreased sales of plastic strapping as well as lost profits attributable to decreased sales of the friction welding tools.

■■■ Assuming, for the purpose of discussing potential damages, that Signode's patents are valid and infringed, Signode is entitled to an award of damages adequate to compensate for the infringement, but in no event less than a reasonable royalty. 35 U.S.C. § 284. A reasonable royalty is a

minimum below which damages may not fall; it is not an exclusive measure of damages. *Zysset v. Popeil Brothers, Inc.,* 318 F.2d 701, 706 (7th Cir.1963), *cert. denied,* 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 610 (1964). A reasonable royalty rate is often awarded when the aggrieved party is unable to establish actual damages. *See, e.g. Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 612 F.2d 1353, 1357, (3rd Cir.), *cert. denied,* 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 30 (1980); *Foster v. American Machine & Foundry Co.,* 492 F.2d 1317, 1321 (2d Cir.), *cert. denied,* 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974); *Zysset v. Popeil Brothers, Inc., supra,* 318 F.2d at 706. In the case before us, Signode was actively selling friction welding tools, was apparently the only seller of such tools in the United States (save its licensee, Titan), and therefore may be able to establish with reasonable certainty the actual amount of profits it lost due to the appellees' activities. Signode is not necessarily limited to a reasonable royalty.

Signode contends that every sale that the appellees make represents a sale lost to Signode. The appellees contest this, pointing out that Signode's licensee may make some of the sales rather than Signode. Moreover, there are several differences between Signode's tools and the Strapex Model 361, so that not every purchaser of the latter would necessarily purchase a Signode friction welder instead. Nevertheless, to estimate maximum potential damages, we shall assume that every sale of the Strapex Model 361 represents a sale lost to Signode. Signode estimates that there may be as many as 3,478 Strapex Model 361 tools in the market by the time Signode's patent expires in 1986. We shall therefore assume that Signode will lose 3,478 sales of its tools.[5]

---

**4.** These figures have been translated from Swiss francs to American dollars using an exchange ratio of 1.9 francs to one dollar. 1980 figures are used because the 1981 audit was still in preparation at the time of the hearing before the magistrate.

**5.** This assumes that this case will not be decided on the merits before the patent expires. If the case is decided earlier and Signode prevails, Signode may be entitled to a permanent injunction enjoining sales during the remaining years of the patent. We express no opinion on the issue of whether a permanent injunction will ultimately be warranted.

In determining Signode's damages from lost sales of tools, the focus is on its lost profits, not the profit made by the appellees.[6]  *See Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964); *Zegers v. Zegers, Inc.,* 458 F.2d 726, 727–29 (7th Cir.), *cert. denied,* 409 U.S. 878, 93 S.Ct. 131, 34 L.Ed.2d 132 (1972).  Although Signode did not present any evidence on the point, for these estimations we shall assume that each lost sale would have been of the Signode model that sells for $985.00.  We shall further assume a generous profit margin of fifty per cent.[7]  These figures yield a maximum lost profit on tool sales of approximately $1.7 million.  Signode has not established that the appellees, with a present combined net worth of over $15 million, are likely to become unable to pay damages for lost sales of tools.[8]

Signode, however, does not rely only on lost sales of tools to establish total potential damages, but rather asserts that it is entitled to compensation for the lost sales of plastic strapping that is used in the tools.  Signode is careful to avoid any implication that it ties the sale of unpatented strapping to the sale of its tools, for tying under appropriate circumstances would violate the anti-trust laws and could constitute misuse of the patent.  *See International Salt Co. v. United States,* 332 U.S. 392, 395–96, 68 S.Ct. 12, 14–15, 92 L.Ed. 20 (1947); *Carbice Corp. v. American Patents Development Corp.,* 283 U.S. 27, 31–35, 51 S.Ct. 334, 335–336, 75 L.Ed. 819 (1931); *United States Gypsum Co. v. National Gypsum Co.,* 387 F.2d 799, 802 (7th Cir.1967), *cert. denied,* 390 U.S. 988, 88 S.Ct. 1184, 19 L.Ed.2d 1292 (1968); *American Lecithin Co. v. Warfield Co.,* 105 F.2d 207, 212 (7th Cir.), *cert. denied,* 308 U.S. 609, 60 S.Ct. 175, 84 L.Ed. 509 (1939).  Rather, Signode contends that as a business reality, once a tool is placed with a customer, that customer usually purchases strapping from the seller of the tool.  Even though Signode denies tying the sale of strapping to the sale of its tools, it contends that the loss it suffers from lost sales of strapping is compensable.

We agree with the position recently taken by the Ninth Circuit that lost sales of unpatented, consumable supplies are not compensable in a patent infringement case.  *Velo-Bind, Inc. v. Minnesota Mining & Mfg. Co.,* 647 F.2d 965, 973 (9th Cir.), *cert. denied,* 454 U.S. 1093, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).  Signode would have no complaint if the appellees had simply cut into its strapping sales by selling plastic strapping.  Moreover, Signode is free to sell its strapping for use in the appellees' tools, which apparently can use the Signode strapping.  Signode's reliance on the "entire market value" rule is misplaced.  That rule allows recovery based on the value of an entire mechanism, even though only one of several features is patented, where sub-

---

**6.**  An infringer of a *design* patent is liable to the patent owner to the extent of his total profit or $250, whichever is greater, under 35 U.S.C. § 289.  Signode, however, does not claim that the appellees have infringed any design patent.

**7.**  While these figures are admittedly arbitrary, this court has chosen them with the intention of demonstrating the maximum possible damages from lost sales of tools established by the present record.  We note that even if Signode's profits were an impossible one hundred per cent on a model that is twice as expensive, the total would still be well under the appellees' net worth.

We do not in any way suggest that the figures we have used for the limited purpose of considering irreparable harm are the figures that must be used when this case is decided on the merits.  Neither do we suggest that using large, "outside" figures is the preferred method of estimating potential damages.  Signode should have presented evidence on this point, for it is Signode's burden to establish irreparable harm.  We use this method in this case only to demonstrate that the evidence in the record, even construed most favorably to Signode, does not establish irreparable harm.

**8.**  Although neither party discusses it and we do not have adequate information to fully address it, we note that the combined net worth figure may include some double counting of assets because Strapex AG owns shares of Weld-Loc.  Since either appellee's net worth alone is sufficiently large to support our conclusion, any double counting of assets would not affect the outcome of this case.

stantially the entire market value of the total mechanism is attributable to the patented feature. *See Crosby Steam Gage and Valve Co. v. Consolidated Safety Valve Co.,* 141 U.S. 441, 12 S.Ct. 49, 35 L.Ed. 809 (1891); *American Safety Table Co. v. Schreiber,* 415 F.2d 373, 377 (2d Cir.1969), *cert. denied,* 396 U.S. 1038, 90 S.Ct. 683, 24 L.Ed.2d 682 (1970); *Paper Converting Machine Co. v. FMC Corp.,* 432 F.Supp. 907, 913 (E.D.Wis.1977), *aff'd mem.,* 588 F.2d 832 (7th Cir.1978). In these cases, and in others that apply the entire market value rule, the patented feature was part of a larger mechanism, and the mechanism without the patented feature had little or no market value. In contrast, the plastic strapping marketed by Signode has market value apart from the friction welding tool, and vice versa. This is simply not a case of patented and unpatented components constituting one functional unit. We hold that damages for lost sales of unpatented, consumable supplies are not contemplated by patent law, and therefore Signode cannot recover for any lost profits attributable to lost sales of plastic strapping.

Signode argues that if it can recover only damages for lost sales of tools, it will be compensated only for infringement of its apparatus patent. Signode seems to feel that it deserves to be compensated for the lost sales of the plastic strapping because it has a process, as well as an apparatus, patent. However, the fact that Signode has both an apparatus and a process patent does not entitle Signode to compensation for lost sales of plastic strapping. Signode could have chosen any number of ways to exploit its patents. For example, it could have

charged one price for the tools and an additional fee for each time the process was used.[9] But Signode, no doubt for what it considered sound business reasons, chose to sell the tools and the right to use the process for one price. The profit Signode loses on each lost sale represents the amount it would have made for the apparatus *and* process patents. If Signode recovers this lost profit in the form of damages, it will be made whole for the infringement of both apparatus and process patents.[10]

Signode has made little showing of inequitable conduct on the part of the appellees that would justify increased damages or an award of attorney fees under 35 U.S.C. §§ 284 and 285. These sections are used to compensate a prevailing party when the opponent's conduct has been clearly inequitable, and thus are applicable only in extraordinary cases. *See Deere & Co. v. International Harvester Co.,* 658 F.2d 1137, 1146–48 (7th Cir.), *cert. denied,* 454 U.S. 969, 102 S.Ct. 514, 70 L.Ed.2d 386 (1981). While the evidence presented to the magistrate indicates that Weld-Loc was advised by its attorney that selling the Strapex Model 361 might infringe on Signode's patents, that alone is not sufficient to establish that Signode will likely merit these extraordinary remedies.[11]

Under its first approach to irreparable harm, Signode had the burden of establishing that the appellees would be unable to respond in damages if a preliminary injunction does not issue. Having failed to prevail on its claim that it will be entitled to compensation for lost profits on plastic strapping, Signode has established a factual record at this point that supports, at most,

**9.** However, the additional fee for the process cannot extend beyond the life of the patent. *See Brulotte v. Thys Co.,* 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964).

**10.** Signode argues that the district court decision impermissibly restricts it from proving "general damages" to which it claims to be entitled. *See Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 505–06, 84 S.Ct. 1526, 1542, 12 L.Ed.2d 457 (1964). However, the district court did not so hold, and

neither do we. We decide only that Signode may not recover for lost sales of the unpatented plastic strapping. Since Signode advances no other "general damages" at this point, we need not further consider the issue.

**11.** Signode may, of course, produce further evidence on these issues at the trial on the merits, and may ultimately prevail. We decide only that, at this preliminary stage, Signode has not established that it will likely prevail on these issues.

potential damages of slightly more than one tenth of the appellees' combined net worth. Signode has failed to meet its burden of proving that appellees will likely be unable to pay damages of this magnitude.

### D. *The Necessity of a Multiplicity of Lawsuits*

Signode argues that it will ultimately be entitled to injunctive relief against all users of the Strapex Model 361. With three to four hundred now in service in this country, Signode feels that ever increasing sales of these tools will increase its eventual litigation burden to the point of irreparable harm. However, if Signode prevails on the merits, the appellees will be obliged to pay any lost profits due to these sales, because they would be direct infringers on the apparatus patent and indirect infringers on the process patent. *See* 35 U.S.C. § 271. As discussed above, the profit Signode makes from each sale of its tools represents its return on both patents. If the appellees pay lost profits, Signode will be made whole for infringement of both the apparatus and process patents without the necessity of further suits against users of the Strapex Model 361.

### IV

Because Signode failed to establish that it will be irreparably harmed if a preliminary injunction does not issue, the decision of the district court denying Signode's motion for a preliminary injunction is affirmed.