**EVEREADY BATTERY COMPANY, INC., Plaintiff,**

v.

**ADOLPH COORS COMPANY, Coors Brewing Company, a Colorado Corporation, Defendants.**

**No. 91 C 2712.**

United States District Court, N.D. Illinois, E.D.

May 15, 1991.

Terry M. Grimm, Steven Francis Molo, Stephen P. Durchslag, Mary Hutchings Reed, and Winston & Strawn, Chicago, Ill., for plaintiff.

John W. Chestnut, Vasilios D. Dossas, Tilton, Fallon, Lungmus & Chestnut, Chicago, Ill. and Todd P. Blakely, and George G. Matava, Sheridan, Ross & McIntosh, Denver, Colo., for defendants.

## ORDER

NORGLE, District Judge.

Before the court is the motion of plaintiff Eveready Battery Company, Inc. ("Eveready") for preliminary injunction. For the reasons discussed below, the motion is denied.

## FACTS

This case arises from a recently made (and not yet aired) beer commercial[1] by

---

**1.** Coors asserts that it had planned to begin running the disputed commercial on April 27, 1991, but voluntarily postponed its airing pending negotiations with Eveready. Portions of the commercial were "previewed" on national tele-

defendant Adolph Coors Company ("Coors") which spoofs a popular series of Eveready battery commercials featuring a pink mechanical toy bunny (the "Energizer Bunny").[2] Eveready seeks to enjoin Coors' use of the disputed beer commercial, alleging copyright infringement, trademark infringement under the Lanham Act, and trademark dilution under the Illinois Anti–Dilution Act.

The "Energizer Bunny" ad campaign began approximately three years ago in an apparent response to a television commercial aired by Eveready's primary competitor, Duracell. The Duracell commercial depicts a large number of mechanical toy bunnies beating horizontally-held "snare drums." In the Duracell commercial, the bunny running on Duracell batteries continues to operate and beat on its drum while all of the other bunnies stop running. The voice-over on the Duracell commercial states that in comparison tests, the Duracell battery outlasted its competitors.

Subsequently, from late 1988 to early 1989, Eveready ran a television commercial containing similar mechanical toy bunnies. Eveready's commercial also begins with a scene depicting a number of these bunnies, beating on horizontally-held "snare drums." The voice-over, speaking over the tinny "rat-atat-tat" tattoo of the drums, states: "Don't be fooled by commercials where one battery company's toy outlasts the others." At this point, the toy bunny in the first row turns its head and opens its eyes wide as the camera focuses in on the Energizer logo emblazoned on a large, vertical bass drum, carried by the toy Energizer Bunny as it enters the picture from screen right. The Energizer Bunny, adorned with sporty sunglasses and beach thongs, strolls across the screen in front of the other bunnies, striking deep, booming notes on its bass drum. The voice-over

continues: "The fact is, Energizer was never invited to their playoffs ... because nothing outlasts the Energizer. They keep going and going and going...." As the voice-over speaks, the Energizer Bunny, which apparently has turned around, pauses in the middle of the picture, leans back while beating on its drum, then exits screen right.

After airing the initial Energizer Bunny commercial, Eveready hired a new ad agency, Chiat/Day/Mojo Inc. Advertising ("Chiat/Day"), which developed an ad campaign revolving around the Energizer Bunny. The series of television commercials created by Chiat/Day as part of this campaign use the Eveready Bunny in a "commercial within a commercial" format. Each spot begins with what at first appears to be a typical television advertisement (which the viewer later realizes is for a fictitious product or service).[3] At some point during the spot, an off-camera drum beat appears to distract the actors in the bogus commercial while the Energizer Bunny—which virtually always appears in its characteristic beach thongs and sunglasses—strolls onto screen beating his bass drum. The actors of the bogus commercial stare incredulously as the intruding mechanical toy bunny nonchalantly propels across the screen, beating the drum and often knocking over props from the fictitious commercial's set. In many of these Energizer commercials, the bunny spins around once and twirls his drum mallets before proceeding to propel out of the picture. Each of the commercials ends with a voice-over which states: "Still going. Nothing outlasts the Energizer. They keep going and going ... [voice fades out]."

In the past two years, Eveready has produced approximately twenty Energizer Bunny commercials with the interruptive

vision on April 26, 1991, on a program called "Entertainment Tonight."

**2.** "Energizer" is a trademark of Eveready, used primarily for batteries.

**3.** The "bogus" commercials used in the Energizer Bunny television spots have advertised items such as "Nasatine," a "Dristan"-like sinus medi-

cine; "Sitagin" hemorrhoid medication akin to "Preparation H"; "Chateau Marmoset" wine; an unidentified long distance telephone service, which appears in the genre of an "MCI" commercial; and a fictitious television series about motorcycle policewomen called "H.I.P.S." (drawing on, among other things, elements of the television series, "C.H.I.P.S."—a show about California highway motorcycle policemen).

"commercial within a commercial" motif. Although these commercials have cost Eveready approximately $55,000,000 over the past two years (apparently a very modest sum by current advertising standards), they have become among the most popular television commercials in the country and are deemed "break through" ads among those in the advertising industry.

On September 11, 1989, Eveready filed for trademark registration of its Energizer Bunny with the United States Patent and Trademark Office ("PTO").[4] An illustration of the mark submitted by Eveready appears in the August 21, 1990 Official Gazette of the PTO. This illustration is a sketch of the Eveready Bunny wearing beach thongs, sunglasses, a vertically held bass drum, and wielding a drum mallet behind its head. The sketch does not designate any colors associated with mark, and the bass drum held by the bunny contains no writing or design.[5]

Eveready has also obtained federal copyright registration for two of its Energizer Bunny interruptive format commercials—one for a bogus product called "Tres Cafe," an instant coffee, and the other for "Chug–A–Cherry," a fictional cherry flavored soda.

In late 1990, Coors Light's Marketing Department[6] decided to create a series of four commercials to be run in the spring of 1991—three "imagery" commercials and one "humorous" commercial. Foote, Cone and Belding Communications, Inc. ("FCB"), the advertising agents for Coors, was given the job of creating a humorous commercial involving Leslie Nielsen, a well-known actor[7] who has been featured in previous Coors Light commercials. Coors subsequently accepted an FCB proposal for a

commercial in which Mr. Nielsen would parody the Energizer Bunny. After clearing the idea with counsel, Coors produced the commercial and prepared it for airing on the major television networks in late April 1991.[8]

The Coors commercial begins with a background voice, speaking over a classical music score, heartily describing the attributes of an unidentified beer. As the voice speaks, the visual shows an extreme close-up of beer pouring into a glass. The voice and music then grind to a halt as a drum beat is heard and Mr. Nielsen appears walking across the visual. Mr. Nielsen wears a conservative, dark business suit, fake white rabbit ears, fuzzy white tail and rabbit feet (which look like rectangular pink slippers). He carries a life-sized bass drum imprinted with the COORS LIGHT logo. After beating the drum several times, Mr. Nielsen spins rapidly seven or so times and, after recovering somewhat from his apparent dizziness, resumes walking. He says "thank you" before exiting off the screen. As Mr. Nielsen exits, another background voice states: "Coors Light, the official beer of the nineties, is the fastest growing light beer in America. It keeps growing and growing and growing ... [voice fades out]." At the end of the spot, a visual appears depicting Coors' "Silver Bullet" logo—a horizontal Coors Light can—streaking across the bottom of the screen, leaving in its wake the mark "Coors Light."

Under the terms of its contract with Mr. Nielsen, Coors may only air this commercial during a six week period ending no later than June 28, 1991 (after which the motion picture "Naked Gun 2½," starring

---

4. *See* Appendix A to this opinion.

5. During the pendency of this trademark application, Eveready entered into negotiations with Duracell in order to avert potential opposition to its registration of the Energizer Bunny mark. In the course of negotiations, Eveready proposed an agreement which would have permitted each company to use its own drumming toy bunny in connection with its products. However, no agreement between the two companies has yet been executed.

6. "Coors Light" is a trademark used by Coors for its "light" (lower calorie, light tasting) beer, which is brewed in Colorado.

7. Mr. Nielsen has starred in recent popular movies such as "Airplane," "The Naked Gun," and "Police Squad." Each of these movies are "slapstick" comedies which are saturated with parody.

8. Coors spent approximately $300,000 to produce this commercial.

Leslie Nielsen, is due for release). Thus, to avoid running up against the June 28 deadline (and to coincide with nation-wide television coverage of the 1991 National Basketball Association playoffs), Coors planned to begin airing this commercial in late April.

As Coors was preparing to air this commercial in late April, Eveready, which had learned of the Nielsen spot, sent threatening "cease and desist" letters to Coors and the television networks which had agreed to play the Coors spot. The television networks responded that they would not play the Nielsen commercial until Eveready and Coors had resolved their dispute. After the parties attempted unsuccessfully to resolve their differences, Eveready filed this action with this court on May 6, 1991[9] and three days later moved for a preliminary injunction to prevent Coors from playing the Nielsen commercial. The parties were granted an expedited hearing on Friday, May 10, 1991, in which they presented evidence and argued the preliminary injunction motion.

## DISCUSSION

■ In order to grant a preliminary injunction, a court must find: 1) the plaintiff has at least a reasonable likelihood of success on the merits; 2) the plaintiff has no adequate remedy at law and will be irreparably harmed if the injunction does not issue; 3) the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and 4) the granting of a preliminary injunction will not disserve the public interest. *See Adams v. Attorney Registration and Disciplinary Comm'n*, 801 F.2d 968, 971 (7th Cir.1986); *see also Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 386–89 (7th Cir.1984). "Of these factors, the likelihood of success generally weighs most heavily in a court's calculus." *Adams*, 801 F.2d at 971. The likelihood of success factor is a threshold requirement to the preliminary injunction analysis. *Id.* How-

ever, this threshold is comparatively low. To establish a likelihood of success, the court must find that the plaintiff's chances of success are "better than negligible." *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988).

■ The plaintiff has the burden of proving each of the preliminary injunction factors. *Roland v. Air Line Employees Ass'n, Int'l*, 753 F.2d 1385, 1392 (7th Cir. 1985). "A preliminary injunction is an extraordinary remedy, available only to plaintiffs who carry the burden of persuasion as to all four factors." *Signode Corp. v. Weld–Loc Systems, Inc.*, 700 F.2d 1108, 1111 (7th Cir.1983). The ultimate decision in weighing and balancing these factors requires a high degree of discretion on the part of the trial judge. *Adams*, 801 F.2d at 971; *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 906 (7th Cir.1986); *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437 (7th Cir.1986). Thus, the trial court's determination as to whether an injunction should issue is given substantial deference on review. *Adams*, 801 F.2d at 971; *A.J. Canfield*, 796 F.2d at 906; *Lawson Products*, 782 F.2d at 1437; *Roland Machinery*, 749 F.2d at 390. The court will address the likelihood of success of each of Eveready's claims seriatim.

### Copyright Infringement

■ To establish a likelihood of success on its copyright claim, Eveready must establish: (1) ownership of a valid copyright in its work, and (2) defendant's "copying" of protectible elements within that work. *See Atari, Inc. v. North American Philips Consumer Elec. Corp.*, 672 F.2d 607, 614 (7th Cir.1982); *see also* 3 M. Nimmer, Nimmer on Copyright § 13.01, at 13–3 to 13–4 (1988). Because direct evidence of "copying" is often unavailable, courts will infer copying where defendant: (1) has access to the copyrighted work, and (2) where the accused work is deemed to be "substantially similar" to the copyrighted work.

---

**9.** The court notes that Coors simultaneously filed suit on this matter in federal district court

in Denver, Colorado.

*Atari,* 672 F.2d at 614. The "substantial similarity" analysis, in turn, concerns "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Id.* In other words, assuming that some "copying" took place, the relevant inquiry becomes whether that copying "went so far as to constitute an improper appropriation." *Id.*

In the present case, it is undisputed that the plaintiff has ownership of valid copyrights in its Energizer Bunny commercials.[10] It is also undisputed that Coors had access to the Energizer spots and incorporated certain elements of those commercials into its commercial. In this sense, it is clear that Coors "copied" something from Eveready's commercials. Therefore, the court must determine whether the copied elements of the Energizer commercials constitute protectible original "expressions"—as opposed to unprotectible "ideas," *see* 17 U.S.C. § 102(b) (copyright protection does not extend to ideas underlying the author's expressions)[11]—and whether the extent of the copying was sufficient to constitute an improper appropriation.

■ In support of its argument that Coors appropriated an improper quantity of protectible expressions, Eveready recites a list of eleven similarities between its Energizer Bunny commercials and Coors' Nielsen commercials. *See* Supplemental Memorandum in Support [of] Plaintiff's Motion for a Preliminary Injunction ("Plaintiff's Supplemental Memorandum"), pp. 3–4.

The most prominent of these similarities are:

1) "both open to a standard television commercial format for a fictional product," *Id.* at p. 3 [the court notes that Coors' commercial actually begins with an apparently typical commercial for an unidentified, but not necessarily "fictional" beer];

2) "both are interrupted by an off camera drumbeat," *Id.* [here, the court observes that in fact the Coors soundtrack grinds to a halt before the drumbeat is heard];

3) "both usually have the Bunny move to the bottom of the screen," *Id.* [the court points out, however that the Coors commercial does not contain a "bunny," but instead features Mr. Nielsen dressed in bunny ears, tail and feet];

4) "the Energizer Bunny usually spins mid-way through his appearance on the screen and Coors' Bunny spins mid-way through his appearance on screen," *Id.* at p. 4 [In fact, whereas the Energizer Bunny often spins once, Mr. Nielsen spins at an exaggerated speed approximately seven times];

5) "the voice over announcer says, "... *it keeps going and going and going ..."* as the Energizer Bunny leaves the screen while the voice over announcer says "... *it keeps growing and growing and growing ..."* as Coors' Bunny leaves the screen," *Id.* (emphasis in original).

Similarly, Coors, in its submissions, recites a list of fifteen differences between its commercial and those of Eveready. Most notably, Coors points out that the rabbit-eared human character in its commercial is a well-known, white haired six foot tall

---

10. In addition to its unchallenged (and therefore presumptively valid) statutory copyright registrations for two of its commercials, Eveready also has ownership rights under the Copyright Act in its unregistered commercials. *See* 17 U.S.C. § 302(a) ("Copyright in a work created on or after January 1, 1978, subsists from its creation ..."); *see also Hays v. Sony Corp. of Am.,* 847 F.2d 412, 415 (7th Cir.1988) (Copyright Act of 1976 "made federal copyright attach at the moment of creation ...")

11. It is established that the copyrightable expressions of a television commercial may include: "individual artistic choices such as particular montage style, camera angle, framing, hairstyle [of actors/actresses], jewelry, decor, makeup and background. These choices express the concept behind any given commercial and distinguish its images and sounds from the otherwise infinite universe of commercials which might have been made." *Chuck Blore & Don Richman, Inc. v. 20/20 Advertising Inc.,* 674 F.Supp. 671, 677 (D.Minn.1987).

male actor in a business suit and not a fifteen inch pink mechanical toy bunny. The court, however, finds it unnecessary to engage in a "substantial similarity" analysis here. Even assuming that Eveready can establish substantial similarity, it has not established a likelihood of success under the "fair use" provisions of the Copyright Act.

Section 107 of the Copyright Act states, in relevant part:

Notwithstanding the provisions of section 106, the fair use of a copyrighted work ... is not an infringement of copyright. In determining whether use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purpose;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. It is well established that parody [12] may qualify a fair use of a copyrighted work under § 107. *See* Notes of Committee on the Judiciary, H.R.Rep. No. 1476, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5678–5679 (which includes, in a non-exhaustive list of "the sort of activities the courts might regard as fair use under the circumstances.... use in a parody of some of the content of the work parodied"); *see also Fisher v. Dees*, 794 F.2d 432, 435 (9th Cir.

1986). However, before addressing the elements of the fair use analysis, the court must address Eveready's argument that: "[t]he promotion for sale of commercial products cannot constitute parody as a matter of law." Plaintiff's Supplemental Memorandum, p. 4.

In support of its position, plaintiff cites *Tin Pan Apple, Inc. v. Miller Brewing Co.*, 737 F.Supp. 826, 831–832 (S.D.N.Y. 1990) and *D.C. Comics v. Crazy Eddie*, 205 U.S.P.Q. 1177 (S.D.N.Y.1979).[13] In *Tin Pan Apple*, District Judge Haight of the Southern District of New York (citing only *D.C. Comics*) held that: "there is ample authority for the proposition that appropriation of copyrighted material solely for personal profit, unrelieved by any creative purpose, cannot constitute parody as a matter of law." *Tin Pan Apple*, 737 F.Supp. at 831. It is not apparent to this court what Judge Haight meant by the phrase "solely for personal profit." To the extent that this phrase may be equated to the phrase "of a commercial nature," the quoted proposition in *Tin Pan Apple* is directly contrary to § 107 of the Copyright Act which expressly states that "the purpose and character of the use, including whether such use is of a *commercial nature*" (emphasis added) is merely one of four factors to consider in the statutory fair use analysis. If "solely for personal profit" means something other than "of a commercial nature," this court fails to see why such a phrase would provide a more accurate description of a television commercial (which was at issue in the *Tin Pan Apple* case as it is here).[14] Although the primary purpose of most television commercials (like other works of a "commercial nature") may be to

---

**12.** "Parody" is defined as "a literary or musical work in which the style of an author or work is closely imitated for comic effect or in ridicule." Webster's Ninth New Collegiate Dictionary 857 (1984).

**13.** The *D.C. Comics* case does not appear to stand for the proposition that a commercial work may not constitute parody. Rather, the *D.C. Comics* court found that a particular television commercial which, "in nearly every aspect," constituted a "detailed copying" of plaintiff's work, was not a parody. 205 U.S.P.Q. at

1178. The court held that: "This is not a case of fair use, but one of unjustifiable appropriation of copyrighted material for personal profit." *Id.*

**14.** The court notes that the word "commercial"—which is not defined in the Copyright Act—may be defined as: "**1 a (1):** occupied with or engaged in commerce or work intended for commerce < ˜artist> ... **2 a:** viewed with regard to profit <a ˜success> ... **b:** ... **4:** supported by advertisers < ˜TV>...." Webster's Ninth New Collegiate Dictionary 264–265 (1984).

increase product sales and thereby increase income, it is not readily apparent that they are therefore devoid of any artistic merit or entertainment value. Notably, not all viewers who laugh at a commercial will buy the advertised product. In this regard, it is also difficult for this court to conclude that the Coors commercial is "unrelieved by any creative purpose." In short, to the extent that the *Tin Pan Apple* case is intended to establish a standard different from that established by Congress in § 107(1) of the Copyright Act, this court declines to follow the former.

Applying the statutory fair use factors to the Coors commercial, the court finds that Eveready cannot establish a likelihood of success on its position that the Nielsen commercial is an infringement of its copyrights. Although the first factor in the § 107 analysis—the purpose and character of Coors' use—weighs in Eveready's favor, none of the remaining three factors are similarly favorable.

The nature of the copyrighted work, like the character of the challenged work, is commercial. Indeed, the two works serve an identical purpose for their respective sponsors. Thus, Eveready cannot argue that its work is deserving of particularly strong protection.[15] Thus, the second factor is at best neutral but certainly does not weigh in favor of Eveready.

■ Next, the court finds that the amount and substantiality of the portion used in relation to the copyrighted work as a whole is not sufficient to weigh in favor of Eveready. On this point, Eveready, quoting *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 757 (9th Cir.1978), asserts that: "One may lawfully parody copyrighted work *only* if he takes no more than is necessary to 'recall or conjure up the object of his satire.'" Plaintiff's Supplemental Memorandum, p. 5 (emphasis in original). Eveready argues that Coors' witness admitted at the preliminary injunction hearing that he took more the minimum necessary to conjure the image of the Energizer rabbit. This court, however, declines to adopt Eveready's rigid interpretation of the so called "conjure up" test. In *Fisher v. Dees,* the Ninth Circuit expressly stated that the "conjure up" test articulated in its *Air Pirates* opinion, was not meant to be interpreted rigidly "to limit the amount of permissible copying to that amount necessary to evoke only *initial* recognition" in the viewer. *Fisher,* 794 F.2d at 438. The *Fisher* court, quoting the Second Circuit opinion in *Elsmere Music, Inc. v. National Broadcasting Co.,* 623 F.2d 252, 253 n. 1 (2d Cir.1980) (per curiam), stated:

> [T]he concept of "conjuring up" an original came into the copyright law not as a limitation on how much of an original may be used, but as a recognition that a parody frequently needs to be more than a fleeting evocation of an original in order to make its humorous point. A parody is entitled at least to "conjure up" the original.

794 F.2d at 439 (emphasis added). *See also Tin Pan Apple,* 737 F.Supp. at 830 ("A parody is entitled at least to 'conjure up' the original. Even more extensive use would still be fair use, provided that parody builds upon the original, using the original as a known element of modern culture and contributing something new for humorous effect or commentary"). Thus, this court holds that while the copyright law imposes limitations on the extent to which a parody may borrow from an original, the "conjure up" test does not articulate this upper limit.

The court finds that the Coors spot did not borrow an impermissible amount of the Eveready commercials for the purposes of the fair use/parody analysis. As Coors points out, the Nielsen commercial is obviously not a verbatim copy of plaintiff's commercials. Rather, Coors' ad merely incorporates certain elements of those commercials necessary to conjure an image of the Eveready spots for humorous effect.

**15.** *See Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975) ("The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good").

Its imitation of the Energizer Bunny is far from excessive. Mr. Nielsen is not a toy (mechanical or otherwise), does not run on batteries, is not fifteen inches tall, is not predominantly pink, does not wear sunglasses or beach thongs, and would probably make a better babysitter than a children's gift. Although Mr. Nielsen dons rabbit ears, tail, and feet (thus imitating certain bunny-like features), he by no means copies the majority of the Energizer Bunny's "look." [16] Indeed, the dissimilarities between the two far outweigh the similarities. Unlike the Energizer Bunny, Mr. Nielsen speaks; he does not disrupt actors in a fictional commercial; and he does not disturb any props on the "fictional" commercial's set.[17] Also notable is the fact that the Coors commercial does not imitate any particular one of the Energizer spots. Instead, it imitates a few identifiable features, exaggerates some, and leaves out most others. Thus, the court finds that the "amount and substantiality" prong of the fair use analysis weighs against Eveready.

■ The fourth prong of the statutory fair use test—the effect of the use upon the potential market for or value of the copyrighted work—also weighs against Eveready. This factor has been described as "undoubtedly the single most important element of fair use." *Fisher*, 794 F.2d at 437 (quoting *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 566, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985)). In the *Fisher* case, the Ninth Circuit discussed the standard applicable this factor when the use at issue is a parody, stating:

> In assessing the economic effect of the parody, the parody's critical impact must be excluded. Through its critical function, a "parody may quite legitimately aim at garroting the original, destroying it commercially as well as artistically." B. Kaplan, *An Unhurried View of Copyright* 69 (1967). Copyright law is not designed to stifle critics.... Accordingly, the economic effect of a parody with which we are concerned is not its potential to destroy or diminish the market for the original—any bad review can have that effect—but rather whether it *fulfills the demand* for the original. Biting criticism suppresses demand; copyright infringement usurps it. Thus, infringement occurs when a parody supplants the original in markets the original is aimed at, or in which the original is or has reasonable potential to become, commercially valuable. [*Citations omitted.*]

*Fisher*, 794 F.2d at 437–438 (emphasis in original). As the *Fisher* case succinctly articulated, for the purposes a copyright fair use analysis, the type of harm to the market with which the court is concerned is limited to the harm likely to be caused by the challenged work usurping or replacing the demand for the original. In the present case, there is no indication that the Coors commercial will supplant the market for the Eveready commercial. Viewers will not stop watching the Eveready commercials in order to watch the Coors commercial on another channel.[18] Thus, to the extent that the Coors commercial may have any effect on the market for the Energizer Bunny commercials, that effect would not be relevant to the copyright fair use analysis. For these reasons, the court finds that Eveready has not established a likelihood of success on its copyright claim.

### Trademark Infringement

■ Eveready's trademark infringement claim is brought under § 43(a) of the Lanham Act. This states that:

---

16. The unmistakable differences between Mr. Nielsen in the Coors commercial and the Energizer Bunny stand in stark contrast to a commercial produced by a Ford car dealership in the Baltimore, Maryland area, which was played at the preliminary injunction hearing. That commercial featured a drumming toy bunny which, unlike Mr. Nielsen, was similar to the Energizer Bunny in virtually every respect. In that commercial, alas, a Ford truck runs over the bunny which is then pictured flattened, with tire tracks running across it.

17. The court also notes that the "fictional" commercial which is interrupted in the Coors spot is itself a beer commercial. Thus, Coors appears to be poking fun at itself as well as at Eveready.

18. The court also notes that because the Coors commercial may only be aired for a maximum of six weeks, it would have little opportunity to "supplant" the Energizer ads in any event.

Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such a person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person ...

\* \* \* \* \* \*

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a) (1988). In order to show a likelihood of success on its Lanham Act claim, Eveready must establish: (1) that it has a protectible trademark, and (2) that Coors' commercial creates a "likelihood of confusion" as to the association or affiliation of Eveready's mark.[19] *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1085 (7th Cir. 1988). Assuming that Eveready has a protectible trademark in its Energizer Bunny, the court finds that Eveready is unable to establish a likelihood of success on its claim that the Coors commercial creates a "likelihood of confusion" as to association with its mark.

In analyzing this likelihood of confusion issue, it is important to note that Eveready's mark does not encompass the conglomeration of elements contained its commercials which constitute protectible expressions under the Copyright Act. The Lanham Act defines "trade-mark" as: "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." 15 U.S.C. § 1127. Accordingly, Eveready's

application for trademark registration contains only a sketch of its drumming toy bunny—a "symbol" used to identify the Energizer product. Notably, the application does not contain any of the other various "artistic expressions" seen in the Energizer spots (i.e., the "commercial within a commercial" motif, the spinning motion of the bunny, etc.).

Thus, the sole question at issue in the present Lanham Act analysis is whether Coors' presentation of Leslie Nielsen in bunny ears, tail and feet, while banging on a bass drum, is sufficient "to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" of Mr. Nielsen or Coors Light with Eveready or the Energizer Bunny symbol. In other words, does the Coors commercial cause its viewers to correlate Coors and its products or symbols with Eveready and its products and symbols in terms of origin, sponsorship, or approval?

Whether a "likelihood of confusion" exists in a particular case is a "question of fact as to the probable or actual actions and reactions of prospective purchasers of the goods or services of the parties." *International Kennel*, 846 F.2d at 1087. Although plaintiffs have not provided evidence which directly addresses this fact issue, the court finds that the likelihood of its succeeding on such a factual showing is negligible. The Seventh Circuit has articulated a list of seven factors which may be important to the likelihood of confusion analysis:

The degree of similarity between the marks in appearance and suggestion; the similarity of the products for which the name is used; the area and manner of concurrent use; the degree of care likely to be exercised by consumers; the strength of the complainant's mark; actual confusion; and intent on the part of the alleged infringer to palm off his products as those of another.

*Int'l Kennel*, 846 F.2d at 1087; *McGraw-Edison Co. v. Walt Disney Productions*,

---

**19.** Eveready concedes that this case does not involve a "confusion of origin" issue. Plaintiff's

Supplemental Memorandum, p. 7.

787 F.2d 1163, 1167–1168 (7th Cir.1986) (quoting *Helene Curtis Indust. Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1330 (7th Cir.1977).

The only factor in this analysis which weighs in favor of plaintiff is the strength of its mark. During the approximately two years of the Energizer Bunny ad campaign, Eveready has produced some twenty commercials featuring its bunny, and these commercials have met with tremendous success. The pink drumming mechanical toy bunny may have developed secondary meaning in the marketplace as a symbol for Energizer products. However, the very strength of the Energizer Bunny mark in this case seems to weigh against a likelihood of confusion, particularly in light of the obvious parody depicted in defendant's use. The degree of similarity between the "marks" in appearance and suggestion is slight. Indeed, the unmistakable *differences* between the Energizer Bunny and Leslie Nielsen in modified rabbit attire arguably generate much of the humor in the Coors parody. Next, the products at issue here are completely dissimilar and do not overlap in any significant manner. No consumer is likely to mistake Coors as the source of origin for Energizer batteries or Eveready as the source of origin for Coors beer. It is also apparent that Coors did not intend to create in consumers the impression that its beer is endorsed or otherwise affiliated with Energizer batteries.[20]

Further, the court notes that Coors' parody defense would likely defeat Eveready's Lanham Act claim in any event. Parody has been recognized as a defense to a trademark infringement action. *See Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ. Group, Inc.*, 886 F.2d 490 (2d Cir. 1989); *see also* Note, *Trademark Parody: A Fair Use and First Amendment Analy-*

sis, 72 Va.L.Rev. 1079 (1986) (discussing the use of the parody defense in trademark infringement and dilution cases). Courts in this district as well have recognized parody as a legitimate use of another's mark. *See General Mills, Inc. v. Henry Regnery Co.*, 421 F.Supp. 359 (N.D.Ill.1976) (denying preliminary injunction of defendant's cookbook, entitled "Morey Amsterdam's Betty Cooker Crock Book For Drunks," after finding no likelihood of confusion with plaintiff's registered trademark, "BETTY CROCKER"). In the *Cliffs Notes* case,[21] the Second Circuit discussed the need to balance the necessity of imitation in parody with the trademark owner's rights in his mark.

> Conflict between these two policies is inevitable in the context of parody, because the keystone of parody is imitation. It is hard to imagine, for example, a successful parody of Time magazine that did not reproduce Time's trademarked red border. A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is *not* the original and is instead a parody. To the extent that it does only the former but not the latter, it is not only a poor parody but also vulnerable under trademark law, since the customer will be confused.

*Cliffs Notes*, 886 F.2d at 494. As the court discussed above, although the Coors parody contains similarities to the Eveready mark, it contains conspicuous and resounding differences as well. To the extent that the Coors commercial conveys the message "that it is the original," it emphatically conveys "that it is not the original." Thus, this court construes the Coors commercial as a permissible parody which does not violate the provisions of the Lanham Act.

**20.** Originally, plaintiff argued that the juxtaposition of their "wholesome" bunny with the sale of a beer product might create an improper impression or negative association in the minds of consumers. *See* Plaintiff's Memorandum in Support of Motion for Preliminary Injunction ("Preliminary Injunction Memorandum"), p. 9. However, it abandoned this argument at the preliminary injunction hearing after defendant played the Eveready "Chateau Marmoset" com-

mercial—in which the Eveready Bunny disrupts a fictitious wine commercial.

**21.** In *Cliffs Notes*, the Second Circuit reversed the district court's preliminary injunction which had enjoined the defendant from selling its parody, "Spy Notes," the cover of which imitated "Cliffs Notes," a well-known study guide published by the plaintiff.

## Trademark Dilution

■ Trademark dilution is not a cause of action under the Lanham Act. In fact, the drafters of the recent Trademark Revision Act considered and ultimately rejected the idea of adding a dilution provision to the federal trademark laws. *See* Geraldson, Partridge, and Welch, *Developments in Trademark and Unfair Competition Law: In the Courts, the Patent Office and Before the Trademark and Appeal Board,* 24 J. Marshall L.Rev. 1 (1990). However, trademark dilution is a recognized cause of action under Illinois law. The Illinois Anti–Dilution Act provides additional protection to trademark owners by preventing the disparagement or erosion of their marks through use by third parties on non-confusing, non-competing products. *See Ringling Bros.—Barnum & Bailey Combined Shows, Inc. v. Celozzi–Ettelson Chevrolet, Inc.,* 855 F.2d 480, 482 (7th Cir.1988). The Illinois Anti–Dilution Act states, in relevant part:

> Every person ... adopting and using a mark, trade name, label or form of advertisement may proceed by suit, and the circuit court shall grant injunctions, to enjoin subsequent use by another of the same or any similar mark, trade name, label or form of advertisement if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark, trade name, label or form of advertisement of the prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services....

Ill.Rev.Stat. ch. 140, para. 22 (1986). In order to succeed on a dilution claim under this Act, a plaintiff must show: 1) that the mark is distinctive, and 2) that the subsequent user's use dilutes that distinctiveness. *Ringling Bros.,* 855 F.2d at 482 (quoting *Hyatt Corp. v. Hyatt Legal Services,* 736 F.2d 1153, 1157 (7th Cir.1984)).

■ In the present case, the plaintiff has established the distinctiveness of the Energizer Bunny mark. Energizer provid-ed evidence that a recent advertising survey listed the Energizer Bunny spots as the seventh-best remembered ad among consumers in the U.S. There is little doubt that the highly touted Eveready Bunny campaign has succeeded in creating an association, in the minds of America's consumers, between the Energizer Bunny and Energizer batteries.[22] However, Energizer has not established a likelihood that Coors' commercial is likely to dilute the distinctiveness of its mark or the power of the association which that mark has created.

The primary case cited in support of Eveready's dilution claim is *Ringling Bros. See* Plaintiff's Supplemental Memorandum, p. 9. In *Ringling Bros.,* the district court granted a preliminary injunction, under the Illinois Anti–Dilution Act, prohibiting defendants (a car dealership in the Chicago area) from using the slogan "The Greatest Used Car Show on Earth." The Seventh Circuit affirmed, holding that plaintiff had established both the distinctiveness of its mark, "The Greatest Show on Earth," and the likelihood that defendant's use of the mark would dilute that distinctiveness. In holding that plaintiff had established dilution, the Seventh Circuit found that "Celozzi–Ettelson's slogan is *deceptively similar* to Ringling Bros.' entire mark." *Ringling Bros.,* 855 F.2d at 482 (emphasis added). The court noted that whereas the defendant could have used the words "The Greatest Used Cars" or "The Greatest Used Cars on Earth," it instead appropriated the plaintiff's *entire mark,* "The Greatest Show on Earth," and then simply added the words "Used Car." *Id.*

Eveready argues that Coors' use of its mark was "deceptively similar" because Coors, like the defendant in *Ringling Bros.,* used the "entire" mark. "Coors has used the entire 'bunny' trademark: the drum, the drumming, the spinning, the interruption of a 'commercial,' as well as the deceptively similar phrase 'It keeps growing and growing and growing....'" Plaintiff's Supplemental Memorandum, p.

---

**22.** At the preliminary injunction hearing, an executive for Eveready testified that the Energizer ads have made 11 billion "impressions" on consumers (where one consumer watching one Energizer ad constitutes a single "impression").

9. However, as the court noted above, while each of the elements mentioned by Eveready may be copyrightable expressions under the Copyright Act, they do not all constitute protectible elements of Eveready's *trademark.* Rather, Eveready's trademark protection is circumscribed by the boundaries of the mark itself, which here is the bunny symbol illustrated in Eveready's trademark application. *See* Appendix A.

Given the limited coverage of plaintiff's mark, and the nature of defendant's taking, the court finds that Eveready's reliance on *Ringling Bros.* is misplaced. Unlike the defendant in *Ringling Bros.*, Coors clearly did not use the entire Eveready Bunny mark. On the contrary, as this court has noted earlier in this opinion, the dissimilarities between the rabbit-attired Nielsen and the Energizer Bunny are more prominent than the similarities.[23] If the Coors, like the *Ringling Bros.* defendant, had used the plaintiff's entire mark, it would have appropriated all of the elements of the symbol, as they appear in plaintiff's trademark application (i.e., mechanical toy bunny with sunglasses, beach thongs and bass drum). Just as Celozzi–Ettelson's addition of two words in the

*Ringling Bros.* case could not rectify its wholesale replication of the Ringling Bros. mark, so the addition of one or two minor features (e.g., a Hawaiian shirt and a beach hat) would not suffice to legitimize a comprehensive reproduction of the mechanical toy bunny. Significantly, the Coors commercial does not contain such a complete taking of the mechanical toy bunny mark. This court finds that the Nielsen character in the Coors commercial is neither identical, nor "deceptively similar," to Eveready's mark.[24] Consequently, Eveready has not established a likelihood of success on its trademark dilution claim.

## CONCLUSION

In sum, the court concludes that the plaintiff has not established a likelihood of success neither on its federal copyright or trademark infringement claims, nor on its state trademark dilution claim. Therefore, the court need not address the remaining preliminary injunction factors.[25] For all the reasons stated above, Eveready's motion for preliminary injunction is denied.

IT IS SO ORDERED.

23. Further, as discussed above, the similarity of Coors' commercial to Eveready's mark, finds some justification in a fair use/parody analysis. *See* Note, *Trademark Parody: A Fair Use and First Amendment Analysis,* 72 Va.L.Rev. 1079, 1103–1104 (1986). As this article points out: "parody directed at the trademark owner or its products does not generally convey information about product price or quality. But parody does inform consumers in a broader sense, by making them aware of others' perceptions of the trademark owner and its products." *Id.* at 1105. In this sense, the court finds that the Coors commercial "informs" consumers in this "broad sense." Its commercial depicts a "parody within a parody"—satirizing the perceived "overplay" of the ubiquitous Energizer Bunny, and expressing the view that through overkill, the parody perpetrator may itself become the parody victim. In the Coors commercial, the bunny has become a parody target, just like the numerous prosaic commercials genres which the Energizer Bunny campaign itself targets in its "commercial within a commercial" spoofs.

24. Some illustrations of a "deceptively similar" use which appropriates less than the entire mark might be a somewhat different looking drumming toy bunny, or perhaps an actor dressed in a full-length bunny suit.

25. Whereas a preliminary injunction may be denied despite a finding of likelihood of success on the merits (i.e., where plaintiff fails to establish no adequate remedy at law, etc.), a preliminary injunction may not be granted where the court finds no likelihood of success on the merits. Logically, if a plaintiff has no likelihood of prevailing at trial, the issues of irreparable harm, balancing of threatened injury, and disservice of public interest are rendered moot. *See Signode,* 700 F.2d at 1111 (to prevail on a preliminary injunction motion, a plaintiff must meet "all four [preliminary injunction] factors"); *see also Adams,* 801 F.2d at 971; *Roland,* 753 F.2d at 1392.

CLASS 9—(Continued).

SN 73-823,590. VIDEONICS, INC., CAMPBELL, CA. FILED 9-5-1989.

# VIDEONICS

FOR VIDEO CONTROL UNITS AND REMOTE CONTROL APPARATUS FOR VIDEO CONTROL UNITS (U.S. CL. 26).
FIRST USE 8-24-1987; IN COMMERCE 8-24-1987.

---

SN 73-823,747. LEYBOLD AG, KOLN, FED REP GERMANY, FILED 9-6-1989.

# VIGIVAC

PRIORITY CLAIMED UNDER SEC. 44(D) ON FED REP GERMANY APPLICATION NO. L32496/9WZ, FILED 7-12-1989, REG. NO. 1146203, DATED 9-15-1989, EXPIRES 7-12-1999.
FOR MONITORS AND CONTROLS FOR VACUUM PUMPS; METERS FOR CHECKING THE OPERATION OF VACUUM PUMPS; OIL FLOW MONITORS FOR USE WITH LUBRICATED VACUUM PUMPS (U.S. CL. 26).

---

SN 73-824,186. LASER MAGNETIC STORAGE INTERNATIONAL COMPANY, COLORADO SPRINGS, CO. FILED 9-8-1989.

# INDEPENDENCE

FOR MAGNETIC TAPE DRIVE FOR USE WITH COMPUTERS (U.S. CL. 26).
FIRST USE 5-0-1989; IN COMMERCE 5-0-1989.

CLASS 9—(Continued).

SN 73-824,785. EVEREADY BATTERY COMPANY, INC., ST. LOUIS, MO. FILED 9-11-1989.

THE STIPPLING SHOWN IN THE DRAWING IS A FEATURE OF THE MARK AND IS NOT INTENDED TO INDICATE COLOR.
THE MARK CONSISTS OF A RABBIT WITH A DRUM.
FOR BATTERIES (U.S. CL. 21).
FIRST USE 10-30-1988; IN COMMERCE 10-30-1988.

---

SN 73-825,118. METROHM LTD., HERISAU, SWITZERLAND, FILED 9-11-1989.

# TITRINO

PRIORITY CLAIMED UNDER SEC. 44(D) ON SWITZERLAND APPLICATION NO. 2112, FILED 3-16-1989, REG. NO. 371365, DATED 3-16-1989, EXPIRES 3-16-2009.
FOR MEASURING AND CHECKING APPARATUS, NAMELY AUTOMATIC TITRATING APPARATUS (U.S. CL. 26).

---

SN 73-826,405. CLARK EQUIPMENT COMPANY, SOUTH BEND, IN. FILED 9-19-1989.

# BOBCAT

OWNER OF U.S. REG. NOS. 670,566, 1,153,505 AND OTHERS.
FOR BATTERIES FOR OFF-ROAD MACHINERY (U.S. CL. 21).
FIRST USE 6-0-1986; IN COMMERCE 6-0-1986.